PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

*Plaintiff-Appellant,*

v.

NAVY FEDERAL CREDIT UNION,

*Defendant-Appellee.*

No. 04-2058

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(CA-03-543-1)

Argued: March 17, 2005

Decided: September 13, 2005

Before KING and GREGORY, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Vacated and remanded by published opinion. Judge King wrote the
opinion, in which Judge Gregory and Senior Judge Hamilton joined.

---

## COUNSEL

**ARGUED:** Susan Lisabeth Starr, UNITED STATES EQUAL
EMPLOYMENT OPPORTUNITY COMMISSION, Appellate Ser-
vices, Washington, D.C., for Appellant. Francis Joseph Nealon, BAL-
LARD, SPAHR, ANDREWS & INGERSOLL, Washington, D.C., for
Appellee. **ON BRIEF:** Eric S. Dreiband, General Counsel, Lorraine

C. Davis, Acting Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Appellant. Jeffrey W. Larroca, Kirsten E. Keating, BALLARD, SPAHR, ANDREWS & INGERSOLL, Washington, D.C., for Appellee.

## OPINION

KING, Circuit Judge:

The Equal Employment Opportunity Commission (the "EEOC") appeals from the district court's judgment in favor of Navy Federal Credit Union ("Navy Federal") on the EEOC's Title VII retaliation claim concerning Donna Santos, a former Navy Federal supervisor. In its complaint in the Eastern District of Virginia (the "Complaint"), the EEOC alleged that Navy Federal had illegally discharged Santos for opposing what she reasonably believed to be the unlawful treatment of one of her subordinates, Tammy Simms. Following extensive discovery proceedings, the district court awarded summary judgment to Navy Federal, concluding that the EEOC's evidence of retaliation was insufficient and that its claim was also barred by laches. *See EEOC v. Navy Fed. Credit Union*, No. CA-03-543-1 (E.D. Va. June 18, 2004) (the "Opinion"). As explained below, we vacate and remand.

### I.

### A.

Navy Federal, a credit union serving employees of the Department of the Navy and their families, is headquartered in Vienna, Virginia.[1]

---

[1]Because this appeal is from an award of summary judgment to Navy Federal, we are obliged to present and assess the relevant facts in the light most favorable to the EEOC, the non-moving party. *See Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004). However, because it is relevant to our analysis under the *McDonnell Douglas* burden-shifting framework, *see* Part IV.A, we also set forth evidence regarding Ms. Santos's supervisory skills that is favorable to Navy Federal.

In April 1995, Donna Santos began working as a supervisor in Navy Federal's Staffing Section, a position entailing her oversight of four subordinates.[2] During her three-month probationary period, Santos received positive performance appraisals, and, in January 1996, she was recognized in an internally circulated e-mail message for "a wonderful idea to help us enhance software support." J.A. 40.[3]

In March 1996, however, representatives of Navy Federal's Employee Relations Section received complaints from three of Santos's subordinates about her performance, including that she was incompetent and error-prone, and that there was a lack of communication, training, and leadership in the Staffing Section. These three employees (including Tammy Simms) also complained that Santos had failed to intervene in issues involving Dianne Snably (the fourth Santos subordinate), and that Santos and Snably seemed to have "teamed" against them. J.A. 77-81. They reported their complaints to the Employee Relations Section on March 7, 14, and 15, 1996.

Notwithstanding these complaints, Santos, on March 24, 1996, received a merit salary increase, and, on April 9, 1996, she received an annual performance appraisal rating her as "highly successful" or "successful" in all scored categories.[4] In this appraisal, Santos was complimented for, *inter alia*, "learning to address and resolve con-

---

[2]According to the EEOC, Santos is now known as "Moira Flanagan." However, we refer to her as "Donna Santos," or simply "Santos," as did the district court.

[3]Citations to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this proceeding.

[4]The April 9, 1996 performance appraisal of Santos reflects that it was prepared on March 14, 1996. In this appraisal, Santos was scored in the following categories: job knowledge; productivity; accuracy; dependability on the job; work methods; problem solving; interpersonal skills; communication skills; work habits; attendance; leadership; organizing and planning; controlling operations; employee relations; employee recognition and development; and evaluating subordinates. The highest possible rating in all of these categories (except attendance) was "outstanding," followed by "highly successful," "successful," "needs improvement," and "unsuccessful." For attendance, the highest available rating was "successful."

flicts among the staff immediately instead of allowing them to fester"; being "intricately involved in motivating the staff"; "delegat[ing] effectively and assign[ing] the workflow so that deadlines and objectives are met"; "deal[ing] equitably with the group"; and "continu[ing] to improve her organizational and planning skills." J.A. 57. It was also recognized that "[t]he Staffing Section continues to improve their team work under [Santos's] direction." *Id.*

After April 1996, assessments of Santos's performance became less laudatory. On July 29, 1996, Santos's immediate supervisor, Jan Herman, met with Santos to discuss three specific issues — failure to post a job vacancy announcement, telephone usage, and coverage of the Staffing Section during lunch. J.A. 86. Then, on August 23, 1996, Herman documented Santos's performance for the month, observing that she needed improvement in the areas of leadership and controlling operations. In support of this assessment, Herman noted the following: Santos was absent from work on the day her Section distributed an important booklet, leaving no one to address problems relating thereto; she attended a computer software class when her Section was already short-staffed; on two occasions, significant mistakes were found in paperwork that had been approved by a subordinate to whom Santos had delegated that responsibility; on three occasions, Staffing Section employees were observed being idle; and some of Santos's subordinates were regularly five to ten minutes late to work in the morning, took overly long breaks and lunches, closed their work stations early, and made excessive personal phone calls. Herman concluded that Santos "needs to pay attention to her staff, what is getting done, and ensuring that the [Staffing] Section is running smoothly and according to policy at all times." J.A. 87. Herman also remarked that Santos "is more interested in her own training and development in PC applications than in her job as [a Navy Federal] supervisor." *Id.* At the time of these observations, Herman considered conducting a "special review" of Santos (which presumably would have involved a more formal performance appraisal and constituted a more grievous mark on Santos's employment record). By early September 1996, however, Herman had decided against such a review, because Santos had improved her job performance. J.A. 96.

### B.

In 1995, Tammy Simms was promoted by Navy Federal to a position in the Staffing Section, which placed her under Santos's supervi-

sion. Over time, Santos criticized Simms's performance in various respects, but complimented it in others. Simms perceived Santos's criticism of her as unfair and complained that Santos overburdened her with an inequitable workload. Other Staffing Section employees, however, believed that Santos sometimes gave special treatment to Simms by, among other things, excusing Simms from physical tasks because of a difficult pregnancy, and adjusting her work schedule to accommodate transportation-related limitations.

Simms was one of the three Santos subordinates who complained in March 1996 about Santos's lack of effective leadership, including her failure to rein in their co-worker Snably. The record reveals that Snably was at times uncivil — and worse — to all of her co-workers, but perhaps especially to those who were African-American women, including Simms and Barbara Stephens.[5] Simms reported to Santos on March 12, 1996, and then to the Employee Relations Section on March 14, 1996, that she believed Snably was hiding her paperwork "to set her up" and had done the same to Stephens. J.A. 79, 500-01. Although Santos expressed her dissatisfaction with Snably to Simms, Simms concluded that Santos was an ineffective supervisor and was thereafter unwilling to go to Santos about problems with Snably. Simms also came to suspect that Santos and others were prejudiced against Simms.

In late August through early September 1996, a series of meetings were held among, in various configurations, Simms, Santos, Snably, Herman, and representatives of the Employee Relations Section. During these meetings, the participants discussed both positive and negative aspects of Simms's performance, her ongoing complaints about Santos and Snably, and Simms's concerns about possible racial discrimination against her and Stephens. These meetings failed to resolve the tensions in the Staffing Section or convince Simms that she was being treated fairly.

---

[5]Prior to March 1996, Stephens had accused, among others, Santos and Snably (who are white) of racial discrimination. By March 1996, Stephens had been discharged by Navy Federal, and her allegations are not directly at issue in this proceeding. However, Stephens's experiences with Snably contributed to Simms's later suspicions that she, too, was the target of racial discrimination in the workplace.

## C.

On September 16, 1996, Simms filed an internal "Request for Resolution Form," with the Employment Relations Section. In it she alleged race, color, sex, and age discrimination, and detailed numerous instances of alleged unfair treatment by Santos, Snably, and others. J.A. 499-510. Shortly thereafter, according to Santos and the EEOC, Navy Federal devised a plan to terminate Simms in retaliation for her discrimination complaint, and to cover up its reasons for the discharge in order to protect itself from liability in subsequent litigation. The EEOC maintains that Santos opposed this retaliation scheme — a position that resulted in her suspension and, ultimately, her discharge from Navy Federal.

By the time Simms lodged her internal complaint, Herman had considered conducting a "special review" of Santos, but decided against it in view of Santos's improved performance. Between the time that Simms filed her complaint and the time that Santos learned of Navy Federal's retaliation scheme, aspects of Santos's performance were assessed on two occasions. On September 19, 1996, Herman observed a problem with Santos and Simms taking a lunch break at the same time, prompting her to warn Santos not to make it a continuing practice. On a more positive note, Personnel Director Ellen Yarborough sent a handwritten note to Santos on October 4, 1996, thanking her for her "hard work in developing a new application for the annual financial plan [and] for completing all the personnel budget requirements." J.A. 41. Yarborough remarked: "We appreciate your dedication to getting it done. Great job!" *Id.* Santos asserts that she received Yarborough's note, along with a cash bonus, as part of the "Directors award" given to one employee annually in the Human Resources Division for outstanding contributions to the Division. J.A. 122.

According to Santos, she shortly thereafter learned of Navy Federal's scheme to retaliate against Simms. The scheme was two-fold: (1) to give Simms favorable performance evaluations, which could be used to defend Navy Federal's actions in subsequent litigation; and (2) to heighten scrutiny of Simms's activity in order to discover an objective and seemingly legitimate basis for her termination.

On October 9, 1996, a meeting was held with Santos, Herman, and two representatives of the Employee Relations Section, including the head of that Section, Angela Culbertson. Culbertson was angry about Simms's allegations of discrimination and declared that she would "get Tammy [Simms] on principle." J.A. 118. Culbertson instructed Santos to heighten surveillance of Simms's work habits, including compiling accuracy reports and documenting the quantity of work that Simms produced. J.A. 216. Santos knew that the oversight responsibilities would fall primarily to Snably, the subject of many of Simms's complaints. She objected to the plan because she felt that it would be unfair to Simms. J.A. 118. Santos proposed that she oversee Simms's work instead, but Culbertson rejected her plan. J.A. 121.

Shortly thereafter Santos participated in a conference call between Culbertson and Navy Federal's outside counsel. While discussing Simms's discrimination complaint, the attorney for Navy Federal suggested that Culbertson "just fire the bitch." J.A. 118. The attorney also warned Culbertson that any negative evaluations of Simms's performance could be perceived as retaliatory. J.A. 120. Santos was then asked whether Simms was likely to file a retaliation claim if she was terminated. When Santos responded affirmatively, she was asked to leave the meeting. Santos later learned that Culbertson had decided to give Simms favorable performance assessments while efforts were made to discover an objective basis for terminating Simms, such as payroll fraud. J.A. 216.

The week before October 25, 1996, Santos was determined to be "well qualified" for a promotion in the Human Resources Division. J.A. 118. Nevertheless, on October 25, Santos received a "special review," which covered the period from May 15, 1996, to October 15, 1996. This review downgraded Santos's performance appraisal in numerous areas relating to her supervisory and management duties. J.A. 60-66.[6] In conjunction with the review, Santos was placed on

---

[6]In her "special review" of October 25, 1996, Santos was scored as "needs improvement" in various areas in which she had scored "successful" or "highly successful" in her performance assessment of April 9, 1996, including interpersonal skills, communication skills, leadership, controlling operations, and evaluating subordinates. In the "special review," Santos was also chastised for, among other things, failing to "maintain[ ] control of the section," taking "a 'hands off' approach to supervising her employees," and failing "to communicate decisions clearly and positively."

probation for 180 days, through approximately April 25, 1997. She retained her usual supervisory responsibilities during that period.

In November 1996, Santos prepared several proposed evaluations of Simms's performance, all of which concluded that Simms's performance needed improvement. Culbertson rejected each of these assessments because they were too negative, and she eventually took it upon herself to prepare a substantially more positive evaluation that rated Simms "successful" or "highly successful" in all scored categories. J.A. 121, 495-98. When asked by Herman to sign Culertson's evaluation of Simms, Santos refused to do so, being unwilling to endorse an evaluation she believed to be fabricated. Herman strongly urged Santos to sign the evaluation and warned her that if she failed to do so her "probationary period would not go well for [her]" and that she was "doing [herself] in." J.A. 121. Santos nevertheless refused to sign the evaluation, prompting Herman to endorse it instead.

On January 4, 1997, Herman called Santos into her office and advised her to begin looking for a different job. Although Navy Federal's usual "special review" policy was to place the targeted individual on probation for 180 days and offer suggestions for improvement during that period, Herman advised Santos that there was "nothing [she was] going to be able to do to change things." J.A. 117. On February 6, 1997, Herman prepared a "special review" of Santos for the period from October 15, 1996 to February 6, 1997, further downgrading her scores and recommending termination for an "inability to improve performance of supervisory responsibilities to a successful level." J.A. 71. On February 14, 1997, Santos was terminated.

II.

On March 25, 1997, Simms resigned from Navy Federal and filed a discrimination complaint against it in the Fairfax County Human Rights Commission (the "FCHRC"). Two days later, on March 27, 1997, Simms's complaint was cross-filed with the EEOC, pursuant to a worksharing agreement between the FCHRC and the EEOC (the "Worksharing Agreement"). On May 15, 1997, Navy Federal initially responded to Simms's complaint in the FCHRC. In its response and subsequent correspondence, Navy Federal disputed Simms's charge of discrimination on several grounds, including that she had received

a "successful" performance appraisal from Herman in January 1997. The FCHRC actively investigated Simms's charge until October 28, 1997, when Navy Federal declined to make a settlement offer to Simms. Thereafter, the FCHRC investigator assigned to the Simms case essentially ignored it while dealing with personal issues, only corresponding with Navy Federal in March 1999 with requests to interview several of its employees. Finally, the FCHRC assigned a new investigator to the Simms case in the fall of 2000.

On February 6, 2001, the FCHRC issued a ruling on Simms's discrimination complaint, finding sufficient evidence of retaliation, but insufficient evidence of race or national origin discrimination. Subsequently, on March 1, 2001, the FCHRC referred the Simms case to the EEOC to ascertain whether it wished to issue a cause finding, noting that the FCHRC had lost jurisdiction, as of March 24, 1999, to conduct a public hearing on Simms's complaint. Four months later, on July 6, 2001, the EEOC issued its own determination, agreeing with the FCHRC's conclusions and additionally finding reasonable cause to believe that "Simms's supervisor" (later identified as Santos) was the victim of retaliation.[7]

Settlement negotiations then commenced between the EEOC (acting on behalf of Simms and Santos) and Navy Federal. Eventually, Simms requested a right-to-sue letter so that she could pursue a federal court action on her own.[8] Meanwhile, settlement negotiations

---

[7]Santos has never filed an administrative charge of discrimination against Navy Federal. In denying Navy Federal's initial motion for summary judgment, however, the district court concluded that the EEOC's investigation of retaliation against Santos fell within the reasonable scope of its investigation into the allegations made by Simms. *EEOC v. Navy Fed. Credit Union*, No. 03-543, at 5-7 (E.D. Va. July 11, 2003). That ruling is not contested in this appeal.

[8]On June 24, 2002, Simms sued Navy Federal in the Eastern District of Virginia, asserting claims of racial discrimination and retaliation. The district court entered judgment in favor of Navy Federal on Simms's discrimination claim, but denied Navy Federal's motion for summary judgment on the claim of retaliation. *Simms v. Navy Fed. Credit Union*, No. 02-0900-A (E.D. Va. Aug. 27, 2002). The parties thereafter settled the matter.

continued between the EEOC (now acting on behalf of Santos only) and Navy Federal. The last of those negotiations occurred between September and November of 2002. Finally, on April 28, 2003, the EEOC initiated this proceeding on Santos's behalf in the Eastern District of Virginia. In its Complaint, the EEOC alleged that Navy Federal had retaliated against Santos in contravention of section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

On June 13, 2003, Navy Federal sought summary judgment on laches grounds, which the court denied on July 11, 2003. On December 5, 2003, following discovery, Navy Federal renewed its motion, asserting the following: (1) that EEOC's evidence of retaliation was insufficient; and (2) that the EEOC's claim was barred by laches. By its Opinion of June 18, 2004, the district court granted summary judgment to Navy Federal both on the merits and on the grounds that laches barred the EEOC's claim. Opinion at 2. The EEOC has filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

III.

We review de novo an award of summary judgment, viewing the facts and inferences drawn therefrom in the light most favorable to the non-moving party. *See Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004). Such an award "is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, . . . show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)) (alteration in original).

Because the equitable balancing required in a laches determination is committed to the discretion of the district court, we may reverse such a ruling only if such discretion was abused. *See White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990). By definition, a court "abuses its discretion when it makes an error of law." *United States v. Ebersole*, 411 F.3d 517, 526-27 (4th Cir. 2005) (internal quotation marks omitted).

IV.

By this appeal the EEOC makes two contentions: (1) that the district court erred in ruling that the EEOC failed to present sufficient evidence of retaliation; and (2) that the court abused its discretion in ruling that laches barred the EEOC's claim on behalf of Santos. We assess each of these contentions in turn.

A.

In assessing the EEOC's retaliation claims, we are obliged to begin with the language of the relevant statutory provisions. In pertinent part, section 704(a) of Title VII prohibits an employer from taking an adverse employment action against any employee "because he has opposed any practice made an unlawful employment practice under this subchapter." Title VII § 704(a), 42 U.S.C. § 2000e-3(a). Under the burden-shifting framework first formulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff bears the initial burden of establishing a prima facie case of retaliation. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998) (citing *McDonnell Douglas*, 411 U.S. at 802-04). Once this burden is carried, the burden shifts to the defendant, who is obliged to articulate a legitimate, non-retaliatory justification for the adverse employment action. *See id.* If the defendant carries this burden, the onus is on the plaintiff to then demonstrate that the non-retaliatory reason advanced by the defendant is a mere pretext. *See id.*; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

By its Opinion, the district court concluded that the EEOC had failed to establish a prima facie case of retaliation against Navy Federal, and that the EEOC had failed to demonstrate that the non-retaliatory reason advanced by Navy Federal was a pretext. Opinion at 7-10. As explained below, we are unable to agree with these conclusions.

1.

In order to establish a prima facie case of retaliation, a plaintiff must prove three elements: (1) that she engaged in a protected activ-

ity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events. *See Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001) (citing *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). Only the first element of this test is at issue here. The district court concluded that the EEOC had failed to establish that Santos had engaged in a protected activity. The court reached this result for two reasons: (a) because Santos had not "opposed" any action taken by Navy Federal; and (b) because Santos had no reasonable basis for believing that any action taken by Navy Federal was unlawful. Opinion at 6-9.

a.

Under the applicable legal principles, in the context of a retaliation claim, a "protected activity" may fall into two categories, opposition and participation. Only one of these categories — opposition — is relevant here. *See Laughlin*, 149 F.3d at 259 (citing 42 U.S.C. § 2000e-3(a)). As we have recognized, protected oppositional activities may include "staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities," *id.*, as well as "complain[ts] . . . about suspected violations," *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 543-44 (4th Cir. 2003).

In concluding that Santos did not oppose any of Navy Federal's actions toward Simms, the district court emphasized that Santos was one of the primary objects of Simms's internal discrimination complaint. Opinion at 7. But the unlawful activity that Santos claims to have opposed was not the discrimination alleged by Simms, but rather Navy Federal's acts of retaliation against Simms for complaining of discrimination. According to Santos, Navy Federal intended to terminate Simms in retaliation for her allegations of discrimination, and to cover up its improper reasons for her termination with ostensibly objective grounds. The evidence reveals that Santos opposed this scheme. Specifically, when Culbertson gave primary supervisory authority over Simms to Snably, Santos objected, believing the transfer of authority from her to Snably to be a component of Navy Federal's improper retaliatory scheme. More importantly, when Santos was asked to sign what she believed to be a misleading but favorable evaluation of Simms's work, Santos refused to do so because of her understanding that Navy Federal intended to use the evaluation to

defend itself from future litigation by Simms.[9] This evidence, showing that Santos objected to Snably's supervision of Simms and that she refused to approve the misleading evaluation of Simms's performance, precluded a ruling in favor of Navy Federal on the question of opposition.

b.

The district court further concluded, however, that even if Santos had opposed actions taken by Navy Federal, she could not have reasonably believed that those actions were in violation of Title VII. Opinion at 7. We have recognized that section 704(a) protects activity in opposition not only to employment actions actually unlawful under Title VII but also employment actions an employee reasonably believes to be unlawful. *See United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, 367 F.3d 245, 255 (4th Cir. 2004), *vacated on other grounds*, 125 S. Ct. 2444 (2005); *see also Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992). In its ruling, the district court reasoned that the increased surveillance and scrutiny of Simms's work habits were merely "administrative actions" that could not reasonably be adverse employment actions. Opinion at 8. It further held that Santos could not reasonably have believed that Navy Federal's efforts to evaluate Simms more favorably than she deserved were adverse to Simms because favorable treatment is "[b]y definition" not adverse. *Id.*

Unfortunately, the district court's analysis on this point took too narrow a view of Navy Federal's actions relating to Simms. Assessing the evidence of Navy Federal's actions towards Simms as a whole, Santos held a reasonable belief that Navy Federal was unlawfully retaliating against Simms. The series of relevant events, recounted by Santos in her testimony before the FCHRC and in her deposition here, shows that her superiors at Navy Federal set in motion a plan to terminate Simms in retaliation for her complaints of racial discrimination, while at the same time seeking to conceal their improper motives under the guise of objective criteria.

---

[9]Indeed, when Simms first filed her complaint against Navy Federal in the FCHRC, the misleading evaluation that Culbertson prepared and that Santos refused to sign figured prominently in Navy Federal's defense.

Shortly after Simms filed her discrimination complaint, Santos attended a meeting where Culbertson became angry and asserted that she would "get Tammy [Simms] on principle." Shortly thereafter Santos participated in the conference call where Navy Federal's lawyer suggested that they "just fire the bitch." During this conference call, the attorney also advised Culbertson that any unfavorable evaluations of Simms's performance could potentially support a retaliation claim by Simms. Culbertson and others at Navy Federal then developed a plan under which Simms would receive favorable evaluations while her actions were scrutinized to discover an objective basis for her discharge, such as payroll fraud, which would insulate Navy Federal from civil liability. Navy Federal was not, in this context, doing Simms a favor by positively assessing her job performance. The heightened scrutiny and favorable evaluations were thus part and parcel of its larger plan to fire Simms for unlawful reasons and to cover up those reasons with pretextual charges. When Santos objected to the added surveillance and refused to sign the misleading evaluation of Simms, she therefore reasonably believed that she was opposing unlawful retaliation. In these circumstances, the EEOC has presented evidence sufficient to establish a prima facie case of unlawful retaliation against Santos.

2.

As explained above, when a plaintiff has established a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. *See Reeves*, 530 U.S. at 143; *Laughlin*, 149 F.3d at 258 (citing *McDonnell Douglas*, 411 U.S. at 802-04). If the defendant carries this burden, the presumption of retaliation falls, and the plaintiff bears the ultimate burden of proving that the defendant's non-retaliatory reason for the adverse employment action was pretextual. *See id.*[10]

In ruling in favor of Navy Federal on the pretext issue, the district court concluded that the EEOC had "presented no evidence to directly

---

[10]Navy Federal sustained its burden of articulating a legitimate, non-retaliatory reason for its adverse employment action against Santos by presenting evidence that it had terminated her because she lacked supervisory skills.

rebut Defendant's evidence that Santos's supervisory skills were deficient." Opinion at 10. Navy Federal did present evidence that, despite Santos's technical skills, she was not considered a capable supervisor. During March 1996, three of Santos's subordinates complained of problems within Santos's Section. Indeed, one complained that there was a lack of communication, training, and leadership in the Staffing Section. Another complained that she was receiving inadequate training and that Santos had lost control of her Section. In July 1996, Herman, Santos's supervisor, met with her to discuss various performance issues, and in August 1996, Herman documented that Santos needed improvement in the areas of leadership and controlling operations.

The summary judgment record, however, also contains evidence demonstrating that Santos's supervisors were pleased with her overall job performance and that her opposition to the plan to terminate Simms was the actual basis for her discharge. In April 1996, shortly after her subordinates complained of her incompetence and lack of supervisory skills, Santos received a positive annual performance appraisal, which praised, *inter alia*, her achievements in resolving interpersonal conflicts in her Section, motivating her staff, and "deal-[ing] equitably with the group." Although by September 1996 Herman had registered complaints about certain aspects of Santos's performance, Herman decided against a "special review" because she believed that Santos's performance had improved. Furthermore, in October 1996, Navy Federal presented Santos with the Human Resources Division's "Directors award," an annual honor accompanied by a cash bonus, and given in recognition of outstanding contributions to the Division.[11] Finally, even after Santos opposed Navy Federal's retaliation scheme against Simms, Santos was deemed "well qualified" for a promotion.

Not only is the evidence in conflict regarding Santos's job performance, but the EEOC also presented evidence from which a jury

[11]Navy Federal contests the evidence of the "Director's award," asserting that Santos received only a handwritten note of thanks for certain technical work she had performed. In the posture of this appeal, however, we are obliged to accept the facts in the light most favorable to the EEOC.

could readily infer that the actual reason for her discharge by Navy Federal was her opposition to its treatment of Simms.[12] The record reveals that, just after Santos expressed opposition to Navy Federal's scheme to retaliate against Simms, Santos was given a "special review," which was significantly harsher than her previous evaluation of April 9, 1996. At the same time, Santos was also placed on probation. In regard to the misleading Simms evaluation, Culbertson repeatedly rejected as overly negative Santos's efforts to fairly assess Simms's performance before completing the Simms evaluation herself. Santos's refusal to approve Culbertson's misleading evaluation of Simms was met sternly by Herman, who warned Santos that she was "doing herself in." Shortly thereafter, Herman advised Santos that she should be searching for new employment. When Santos asked what steps she could take to avoid termination, Herman responded that there was nothing she could do, despite the fact that Navy Federal's general probation policy was to offer suggestions for improvement to probationary employees such as Santos. Whatever Santos's skills as a supervisor, the evidence, viewed in the proper light, warrants the inference that Santos was fired because of her opposition to what she reasonably perceived to be a concerted effort by Navy Federal to terminate Simms for unlawful reasons.[13] As a result, the district

***

[12]We observe that this evidence (that Santos was actually fired for opposing the retaliation scheme against Simms) best supports Santos's claim of pretext. To overcome the burden of proving that the reason for termination advanced by Navy Federal was a pretext, Santos was not necessarily required to prove that she was a good supervisor. She needed only to prove that her lack of skill as a supervisor was not the cause of her termination. *See Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) ("[T]he plaintiff can prove pretext by showing that the [defendant's] explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [retaliation].") (internal quotation marks omitted).

[13]Indeed, it appears that Santos's belief that Navy Federal was retaliating against Simms was not only reasonable but correct as well. The evidence of Navy Federal's scheme clearly warrants the conclusion that Navy Federal was retaliating against Simms. *Cf. LaFond v. Gen. Physics Serv. Corp.*, 50 F.3d 165, 175-76 (2d Cir. 1995) (reversing summary judgment in favor of defendant-employer where plaintiff-employee presented evidence that defendant's "stated reason for discharging him was

court's ruling in favor of Navy Federal on the pretext issue was erroneous.

### B.

As an alternative ground for its summary judgment award to Navy Federal, the district court concluded that the doctrine of laches bars the EEOC's claim. In so ruling, it based its decision wholly on the delay by the FCHRC while the matter was pending in Fairfax County. Opinion at 11-12. Under our precedent, the equitable defense of laches requires a defendant to prove "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) (internal quotation marks omitted). The first element of laches, lack of diligence, is satisfied where a plaintiff has unreasonably delayed in pursuing his claim. *See id.* On this point, the court observed that, because the FCHRC had proceeded so slowly, the EEOC "was unable to adopt the FCHRC's findings and move forward until July 2001," over four years after Simms filed her initial complaint. Opinion at 12. The "unreasonable delay" identified by the court was the failure of the FCHRC to timely investigate Simms's claim. The court thus attributed to the *EEOC* the delay caused by the *FCHRC* in concluding that laches bars the claim asserted in the EEOC's Complaint.[14] As explained below, the court erred in imputing the actions of the FCHRC to the EEOC.

---

a pretext concealing a retaliatory motive"). Indeed, after Simms filed her complaint with the FCHRC, both the FCHRC and the EEOC concluded that Simms's retaliation complaint had merit. And, when Simms pursued her claims against Navy Federal in federal court, the district court denied summary judgment to Navy Federal on Simms's retaliation claim. *Simms v. Navy Fed. Credit Union*, No. 02-0900-A (E.D. Va. Aug. 27, 2002).

[14]Although the district court, by its Opinion of June 18, 2004, granted judgment in favor of Navy Federal on the laches issue, it had rejected a laches claim of Navy Federal's in its earlier ruling of July 11, 2003. *EEOC v. Navy Fed. Credit Union*, No. 03-543, at 8 (E.D. Va. July 11, 2003) ("[I]t does not appear that the claim was neglected or abandoned by the [FCHRC] or that their efforts were dilatory or the result of unreasonable procrastination."). In fairness to the district court, its second ruling was made after discovery revealed more details concerning the FCHRC's handling of the Simms matter.

In support of the district court's ruling on this issue, Navy Federal maintains that an agency relationship exists between the EEOC and the FCHRC. Based on our analysis of the pertinent statutory provisions, however, the two agencies operate with substantial independence. Title VII's provisions regarding "FEP" or "deferral" agencies such as the FCHRC,[15] including sections 706(c)-(e) and 709(b)-(d). *See* 42 U.S.C. §§ 2000e-5(c) to (e), §§ 2000e-8(b) to (d). These provisions are best understood as creating a system of "cooperative federalism," under which, in the interests of comity, the EEOC and state and local authorities share primary responsibility to enforce the civil rights laws. *See, e.g.*, Phillip J. Weiser, *Towards a Constitutional Architecture for Cooperative Federalism*, 79 N.C. L. Rev. 663, 671 (2001) ("[R]eal authority under [cooperative federalism] regimes often rests with the states which ultimately exercise considerable discretion in making and implementing policy."). Sections 709(c) and (d) of Title VII, for example, grant deferral agencies exclusive jurisdiction for at least sixty days to act upon charges arising within their respective jurisdictions. 42 U.S.C. § 2000e-5(c) to (d). The courts have interpreted those provisions as being designed to provide the deferral agencies with the opportunity to resolve discrimination claims without federal intervention. *See EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 110-11 (1988) (citing both Supreme Court decisions and Title VII's legislative history in support of this proposition); *Puryear v. County of Roanoke*, 214 F.3d 514, 517 (4th Cir. 2000) ("The purpose of the presumptive sixty-day deferral period is comity — to provide states and localities the first opportunity to combat discrimination, free from premature federal intervention."); *se also Love v. Pullman Co.*, 404 U.S. 522, 526 (1972)). These understandings rest on the premise that deferral agencies such as the FCHRC enjoy a substantial degree of autonomy and discretion.

---

[15]A "FEP" (an acronym for "fair employment practices") or "deferral" agency is a state or local agency that enforces state and local civil rights laws. *See* Title VII § 706(c), 42 U.S.C. § 2000e-5(c). The jurisdiction of such agencies overlaps that of the EEOC. *See* 29 C.F.R. § 1601.13(a)(3). In the spirit of limiting federal intrusion on state functions, such an agency enjoys substantial independence from the EEOC, but only if the jurisdiction in which the agency is organized has "a fair employment practice law" that the agency is empowered to enforce. *See* 29 C.F.R. § 1601.70(a). The FCHRC is such a deferral agency. *See* 29 C.F.R. § 1601.80.

In further support of its contention that the EEOC and the FCHRC enjoy an agency relationship, Navy Federal relies on section II.A of the Worksharing Agreement, under which each agency designates the other as its agent "for the purpose of receiving and drafting charges." Yet, the Worksharing Agreement, when viewed as a whole, is consistent with our assessment of the statutory framework for the relationship between the EEOC and the FCHRC. The overall thrust of the Worksharing Agreement, as its title suggests, is to divide the workload on proceedings over which the two agencies possess common jurisdiction. Section III.A.1 of the Worksharing Agreement lists those matters that the EEOC is required to initially process, while section III.A.2 lists those committed to the authority of the FCHRC. The independence that the two agencies retain to process and investigate their own charges is made evident by section II.C of the Agreement, which provides that "[n]ormally, once an Agency begins an investigation, it resolves the charge." Indeed, the designation of each agency as an agent of the other for the purpose of receiving and drafting charges is simply a matter of convenience for the charging party. Under section II.A, the receipt by either agency of a charge automatically initiates the proceeding for the purposes of Title VII's timing provisions, and the charges are freely transferred between the two agencies. The Worksharing Agreement, therefore, does not alter the fact that the EEOC and the FCHRC operate with substantial independence and autonomy.[16]

The autonomy enjoyed by the EEOC and the FCHRC controls our assessment of the laches issue. The doctrine of laches requires that a party demonstrate a "lack of diligence *by the party against whom the defense is asserted*." *White*, 909 F.2d at 102 (emphasis added) (internal quotation marks omitted). Absent a showing that the delaying entity is the agent or alter ego of the party against whom laches is asserted, we are unable to penalize the latter (the EEOC) for the actions of the former (the FCHRC). By attributing the FCHRC's delay to the EEOC for laches purposes, the district court made a legal

---

[16]That the EEOC and the FCHRC operate autonomously is further demonstrated by their handling of the Simms matter. After the FCHRC referred the case to the EEOC, the EEOC, rather than simply adopting the FCHRC's findings, conducted its own investigation of the matter and decided to pursue a claim on behalf of Santos as well as Simms.

error, constituting an abuse of discretion. *See Ebersole*, 411 F.3d at 526-27.[17]

## V.

Pursuant to the foregoing, we vacate the judgment in favor of Navy Federal and remand for such further proceedings as may be appropriate.

*VACATED AND REMANDED*

---

[17]Because the district court erred in resolving the issue of whether the EEOC unreasonably delayed, we need not reach the issue of whether Navy Federal was unduly prejudiced by any delay.