**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 05-1449**

CYNTHIA MANN,

Plaintiff - Appellant,

versus

FIRST UNION NATIONAL BANK; FIRST UNION
SECURITIES, INCORPORATED,

Defendants - Appellees.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Carl Horn III, Magistrate Judge. (CA-00-264-H)

Argued: March 14, 2006                    Decided: June 13, 2006

Before WIDENER, NIEMEYER, and KING, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Thomas Drake Garlitz, GARLITZ & WILLIAMSON, P.L.L.C., Charlotte, North Carolina, for Appellant. Marylin E. Culp, LITTLER MENDELSON, P.C., Charlotte, North Carolina, for Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Cynthia Mann appeals from the district court's award of summary judgment to her former employers, defendants First Union National Bank and First Union Securities, Inc. (collectively, "First Union"), in her employment discrimination action. Although Mann initially sought relief under several theories, on appeal she principally challenges only the court's award of summary judgment on her two retaliation claims, brought under Title VII of the Civil Rights Act of 1964. As explained below, we affirm.[1]

## I.

Mann was employed by First Union for over five years, from May 17, 1993, until her termination on September 17, 1998.[2] Prior to her employment with First Union, she obtained a Masters of Business Administration from the Harvard Business School and worked for four years at the Salomon Brothers investment banking firm in New York

---

[1]Mann also appeals from the district court's partial denial of her first motion to strike documents filed by First Union, as well as its denial of her second and third motions to strike. We have carefully reviewed those challenged rulings, perceive no abuse of discretion, and are content to affirm them on the sound reasoning of the district court. See Mann v. First Union Nat'l Bank, No. CA-00-264-H, slip op. at 4-21 (M.D. N.C. Mar. 17, 2005) (Memorandum Opinion and Judgment).

[2]By virtue of a 2001 merger, First Union has been integrated into Wachovia Bank, National Association. See Wachovia Bank, Nat'l Ass'n. v. Schmidt, 445 F.3d 762, 765 n.1 (4th Cir. 2006). At all times relevant and in all court documents pertaining to this proceeding, the defendants have been referred to as "First Union," and we refer to them as such herein.

City.  In October 1994, Mann was assigned to First Union's newly formed Commercial Real Estate Finance Group (the "CREF Group"), where she was employed as a Junior Trader of Commercial Mortgage Backed Securities ("CMBS").[3]  According to Mann's affidavit, she was one of two women employed in a "key role" within the CREF Group.  See J.A. 566.[4]  In May 1995, Steve Jones, who had been the Primary CMBS Trader, was transferred to a different position within First Union, and Mann assumed the role of Primary CMBS Trader.  In that position, Mann had numerous responsibilities, which included acting as a trade manager and overseeing risk management ("hedging").

From the outset of Mann's employment in the CREF Group at First Union, she had difficulties communicating and interacting amicably with her co-workers and with management.  Her evaluations consistently reflected that her work was superior, but that her interpersonal skills were lacking.  Over time, tensions built between Mann and management concerning the scope of her duties.  Mann apparently saw herself primarily as a "trader," responsible for high-risk investments, while First Union's management insisted

---

[3]Because Mann appeals from the district court's award of summary judgment to First Union, the facts are presented in the light most favorable to her.  See Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 418 (4th Cir.2004).

[4]Our citations to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

on restricting Mann to the less-glamorous task of hedging.[5]  At various times in January 1996, and again in January and February 1997, Mann informed her supervisors, Mike Greco and Larry Brown, that she was interested in promotions (which, according to Mann, were not normally publicized at First Union), and she also told her superiors that she was dissatisfied with her compensation.

According to Mann's deposition, First Union hired Peter Chan into the CREF Group in 1996, and thereafter began reassigning Mann's duties to him.  Mann testified that in March and April 1997 she had conversations with Greco and Brown in which they "clarified" her role with First Union by giving her "trading responsibilities" to Chan.  J.A. 394.  Thereafter, on July 22, 1997, Mann met with Greco to discuss why she had not received a mid-year promotion.  At the meeting, Mann told Greco that she felt that she was being discriminated against because of her gender.  Greco "became infuriated, ordered [her] out of his office and told [her] he would never speak with [her] again."  J.A. 568.  Upon leaving Greco's office, Mann went directly to the office of Brian Simpson, Greco's supervisor, to schedule an appointment.  As she

---

[5]Apparently, there is a sharp divide within the investment banking industry between "hedgers" and "traders."  Although both hedgers and traders buy and sell investments, a trader is expected to invest actively and aggressively, generating profits, while a hedger is expected to invest more conservatively and maintain market positions.  It also appears that, in the industry, traders are generally better paid and more respected than hedgers.

waited to see Simpson, "Greco came down the hall shouting to . . . Simpson that he wanted [Mann] fired." Id. at 569.

On July 28, 1997, Mann filed an internal complaint with First Union's Human Relations Department, whereby she requested an investigation into whether she had been the victim of gender discrimination. Her internal complaint was premised, in part, on her assertion that the "Real Estate Products Group Management promoted and/or gave less qualified men roles that [Mann] held or in which [she] was entitled to function." J.A. 577.

Thereafter, Vaughn Moore, First Union's Assistant Vice President for the Human Resources Division, investigated Mann's internal complaint. On October 29, 1996, Moore wrote Mann to inform her that he had completed his investigation and, on the basis thereof, had determined that her discrimination claims were unsubstantiated. By his letter, Moore asserted that Mann had been relegated to hedging duties due to a combination of "practical" concerns and her inability to work well with clients and customers. J.A. 579. Additionally, Moore related his conclusion that "a primary factor in the conflict between [Mann] and management . . . [was] poor communication and [a] lack of clarity" concerning her role. Id. at 580.[6] Moore informed Mann that steps would be taken

---

[6]In response to Mann's concerns that Moore was not qualified to investigate her complaints because he did not fully understand the commercial trading business, First Union hired an outside securities lawyer, Jeffery Davis, to independently investigate Mann's complaint. Following his investigation, Davis agreed with

in order to improve her working situation. Pursuant to Moore's recommendation, Mann met with Brown and Simpson on November 6, 1997. At that meeting, Brown told Mann that, thenceforth, she would "only be a hedger." J.A. 569.

On January 22, 1998, Mann received her last formal evaluation at First Union. This evaluation was completed by Brown, who rated Mann's overall performance as "Meets Expectations." J.A. 361. By that evaluation, Brown enumerated specific areas of needed improvement for Mann to focus on during the first quarter of 1998, directing her to "[s]how sensitivity to the roles of [her] peers, supervisors, and subordinates"; to "[b]e careful not to encroach on other employees' responsibilities"; and to "[a]pproach co-workers in a positive, productive manner." Id. Brown's evaluation further advised Mann that she needed to "understand and accept that decisions may be made by management that incorporate factors beyond [Mann's] immediate scope," and that flexibility would "be a critical success factor" for her. Id. By their signatures on the evaluation, Brown and Mann acknowledged that they had "discussed performance results and established performance goals and development plans for 1998." Id.

In February 1998, Brown and Greco left First Union. Thereafter, First Union appointed Barry Reiner and Wes Jones to replace Brown and Greco as Mann's supervisors. Throughout the

---

Moore's conclusions.

6

Spring and Summer of 1998, Mann and First Union's management continued to have difficulties relating to Mann's constant frustration at having been relegated to the position of hedger.

On September 9, 1998, Mann sent Reiner a memorandum, contending that First Union had discriminated against her on the basis of her gender by offering a woman named Nicole Feldman a position within the CREF Group without first consulting Mann. The next day, September 10, 1998, Mann sent Reiner a second memorandum, complaining that her exclusion from an internal sales meeting amounted to gender discrimination. Reiner responded to Mann by email on September 10, 1998, stating that he and Mann needed to discuss the issues raised in her memoranda in person, and also asserting that (1) Mann had been given the opportunity to express her views regarding Feldman and that Reiner simply disagreed with her; (2) Feldman was not hired as part of an "agenda," but rather "to get much needed help on board quickly"; (3) Mann continued to misstate her role as "senior trader," when, in fact, her function was "to be primarily hedge trading"; (4) the other positions Mann wished to fill would not be her "highest and best use"; and (5) Mann needed to "have more of a team oriented focus." J.A. 369-70.

That same day, September 10, 1998, Mann sent Reiner another memorandum, by which she asserted that Tim Martin, a member of the CREF Group, had been disrespectful to her. According to this memorandum, Martin was on the phone while Mann was working at her

adjacent computer with a member of the technical support staff and, during the course of his conversation, Martin turned towards Mann and said (to the person on the phone) "I sit next to a nosey busy body [sic] who sits on this desk and listens to everything I say. I'll have to call you from another phone off the desk." J.A. 372. In her September 10, 1998 memorandum, Mann related that she was disturbed that "this level of disrespect is tolerated in our environment," and demanded a "verbal apology" from Martin and that "First Union's management . . . stop condoning such behavior." Id.

Meanwhile, September 1998 turned out to be a particularly volatile time in the investment banking business. The bond market slipped, causing financial institutions, including First Union, to experience substantial losses. By his affidavit, Wes Jones stated that he informed First Union's hedgers in September 1998 that the business was experiencing heavy losses, and that he needed accurate information concerning everyone's market position "on a daily and even hourly basis." J.A. 204. In so doing, Jones advised that he expected every hedger's market position to be slipping, and that he would not look negatively on anyone who was losing money. Jones further asserted that, given the rapidly changing market conditions, he needed "a very accurate picture of where [everyone] stood in the market." Id.

According to Jones, "everyone, except Mann, marked down their positions as accurately as they could with the information

available to them." J.A. 204. Jones stated that "[w]e began to suspect that Mann was mis-marking or mis-reporting her position because her reports did not match what was happening in the market." Id. After investigating, Jones and other managers "determined that the gains Mann was reporting were on her short positions only and failed to reflect losses on her long positions." Id. Jones concluded that Mann was reporting her market position "without representing the full loss in her long position — something that is an unacceptable practice." Id.

On September 17, 1998, Mann met with Jones, Reiner, and Dan Comisar of the Human Resources Division. At that meeting, Mann was informed that she was being terminated for failing to accurately report her market position. According to Mann, she protested that her reports were all correct, and Jones informed her that her termination was "the result of a series of things." J.A. 573. Specifically, Jones stated that Mann's termination was also due to her failure to accept her role as a hedger, and that it had "a lot to do with last week." Id. Mann responded that she should not be fired for complaining about gender discrimination, and Reiner asserted that her complaints were not the reason for her termination. According to Mann, Jones subsequently stated that Mann was being terminated "because of" her recent memoranda, which Jones described as "insubordinate, disruptive, and distracting." Id.

9

On March 8, 1998, Mann filed a complaint with the Equal Opportunity Employment Commission (the "EEOC"). On November 10, 1999, the EEOC issued Mann a right to sue letter. Thereafter, on February 7, 2000, Mann instituted this civil action in the Northern District of Illinois. By her Complaint, she initiated claims under Title VII and state tort law, and sought back pay, front pay, damages for mental anguish and suffering, punitive damages, an award of attorneys' fees and costs, and "[s]uch other and further relief as this Court may deem just and proper." J.A. 17-18. By Order of May 18, 2000, the case was transferred to the Western District of North Carolina.[7]

Following discovery proceedings, First Union, on December 1, 2003, filed a motion for summary judgment in the district court. And, by Order of March 17, 2005, the court awarded the summary judgment sought by First Union. See Mann v. First Union Nat'l Bank, No. CA-00-264-H (M.D. N.C. Mar. 17, 2005). On April 15, 2005, Mann timely noted her appeal of the district court's ruling, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

---

[7]After this case was transferred to the Western District of North Carolina, the parties consented to have the matter handled exclusively by a United States Magistrate Judge, in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73(b). The case was initially assigned to then-Magistrate Judge McKnight, who retained the matter upon receiving his Commission as a district judge on August 25, 2003. When Judge McKnight died prematurely on November 27, 2004, the case was reassigned to Magistrate Judge Horn, who rendered the decision from which this appeal emanates.

## II.

We review de novo an award of summary judgment, viewing the facts and inferences drawn therefrom in the light most favorable to the non-moving party. Baqir v. Principi, 434 F.3d 733, 741 (4th Cir. 2006). Summary judgment is not appropriate unless "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(c)) (alteration and internal quotation marks omitted).

## III.

On appeal, Mann contends that the district court erred in awarding First Union summary judgment on her two Title VII retaliation claims, the first of which relates to her demotion to the position of hedger (the "retaliatory demotion claim"), and the second of which pertains to her termination (the "retaliatory termination claim"). In pertinent part, section 704(a) of Title VII prohibits an employer from taking an adverse employment action against any employee "because he has opposed any practice made an unlawful employment practice by this subchapter." Title VII § 704(a), 42 U.S.C. § 2000e-3(a). Under the burden-shifting framework formulated by the Supreme Court in McDonnell Douglas Corp. v Green, a Title VII plaintiff bears the initial burden of

11

making out a prima facie case of retaliation.  See 411 U.S. 792, 802-04 (1973).  "In order to establish a prima facie case of retaliation, a plaintiff must prove three elements:  (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events."  EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir. 2005).  As explained below, Mann has failed to present a prima facie case of retaliation with respect to either of her retaliation claims.

A.

 By her retaliatory demotion claim, Mann contends that First Union stripped her of her duties as a trader (thereby relegating her to the role of hedger) in retaliation for her July 22, 1997 oral complaint of gender discrimination to Mr. Greco and the internal complaint she filed with First Union's Human Relations Department on July 28, 1997.  Mann's own testimony shows conclusively, however, that no causal nexus existed between her demotion and her July 1997 complaints.  In her deposition, Mann testified that Brown and Greco "clarified" her role with First Union in March and April 1997 by assigning her trading responsibilities to Chan.  J.A. 394.  And such an action, having occurred in March and April 1997, could not have been due to Mann's complaints of July 1997.  Cf. Thompson v. Potomac Elec. Power Co.,

12

312 F.3d 645, 651 (4th Cir. 2002) ("The district court rightly found that the continuation of the alleged adverse action after the filing of a discrimination complaint did not, without more, support Thompson's prima facie burden of showing causation."). Indeed, as the district court observed, Mann's July 28, 1997 internal complaint was actually premised on First Union's reallocation of her trading duties to Chan. In these circumstances, Mann is unable to show a causal connection between her July 1997 complaints and her earlier demotion to the position of hedger in March and April 1997. The district court thus did not err in awarding summary judgment to First Union on the retaliatory demotion claim.

B.

In her retaliatory termination claim, Mann maintains that First Union contravened Title VII by firing her in retaliation for her memoranda of September 9 and 10, 1998. As related above, in order to establish the first prong of her retaliation claim, Mann is obliged to show that, by sending such memoranda, she was engaging in a protected activity. See Navy Fed., 424 F.3d at 405-06. Title VII "protects activity in opposition not only to employment actions actually unlawful under Title VII but also employment actions an employee reasonably believes to be unlawful." Id. at 406. Mann, however, could not have reasonably believed that

13

the activities she complained of in her September 1998 memoranda were unlawful employment actions prohibited by Title VII.

By that memoranda, Mann contended that she had suffered gender discrimination (1) when she was not consulted on the hiring of Feldman, a female job applicant; (2) by being excluded from a sales meeting; and (3) by Martin's comment that she was "a nosey busy body." Viewing these incidents either separately or in the aggregate, no reasonable person could have believed that Title VII had been, or was in the process of being, contravened. First, other than Mann's bare assertions, there is no evidence that she was excluded from the Feldman hiring decision or the sales meeting because of her gender, and she therefore had no reason to conclude that the actions were taken on such a basis. See Goldberg v. B. Green and Co., Inc., 836 F.2d 845, 848 (4th Cir. 1988) (recognizing that plaintiff's "own naked opinion, without more, is not enough to establish a prima facie case" of discrimination). Moreover, no reasonable employee could have believed that Martin's "nosey busy body" comment constituted the sort of severe or pervasive conduct that contravenes Title VII. Cf. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (per curiam) (concluding that no reasonable person could have believed that Title VII was violated when, after reading crude comment related in prospective employee's psychological evaluation, plaintiff's male supervisor and co-worker engaged in brief, light banter). In these circumstances, the

14

district court properly awarded summary judgment to First Union on the retaliatory termination claim.

IV.

Pursuant to the foregoing, we affirm the district court's award of summary judgment to First Union.

AFFIRMED

15