Rehearing granted, July 5, 2006

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ROBERT L. JORDAN,
　　　　　　　　*Plaintiff-Appellant,*

v.

ALTERNATIVE RESOURCES
CORPORATION; INTERNATIONAL
BUSINESS MACHINES CORPORATION,
　　　　　　　　*Defendants-Appellees.*

⎫
⎬　　No. 05-1485
⎭

THE METROPOLITAN WASHINGTON
EMPLOYMENT LAWYERS ASSOCIATION;
PUBLIC JUSTICE CENTER; EQUAL
EMPLOYMENT OPPORTUNITY
COMMISSION,
　　　　　　　*Amici Supporting Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CA-04-1091-8-DKC)

Argued: March 14, 2006

Decided: May 12, 2006

Before WIDENER, NIEMEYER, and KING, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the majority opinion, in which Judge Widener joined. Judge King wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Stephen Zak Chertkof, HELLER, HURON, CHERTKOF, LERNER, SIMON & SALZMAN, P.L.L.C., Washington, D.C., for Appellant. Paul D. Ramshaw, UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Appellate Services, Washington, D.C., for Equal Employment Opportunity Commission, Amicus Supporting Appellant. William C. Sammons, TYDINGS & ROSENBERG, Baltimore, Maryland, for Appellees. **ON BRIEF:** Douglas B. Huron, Tammany M. Kramer, HELLER, HURON, CHERTKOF, LERNER, SIMON & SALZMAN, P.L.L.C., Washington, D.C., for Appellant. Marc R. Jacobs, SEYFARTH SHAW, L.L.P., Chicago, Illinois, for Appellee Alternative Resources Corporation; J. Hardin Marion, Melvina C. Ford, TYDINGS & ROSENBERG, Baltimore, Maryland, for Appellee International Business Machines Corporation. R. Scott Oswald, EMPLOYMENT LAW GROUP, P.L.L.C., Washington, D.C., for The Metropolitan Washington Employment Lawyers Association and Public Justice Center, Amici Supporting Appellant. Eric S. Dreiband, General Counsel, Vincent J. Blackwood, Acting Associate General Counsel, UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Equal Employment Opportunity Commission, Amicus Supporting Appellant.

---

**OPINION**

NIEMEYER, Circuit Judge:

When the news broke in October 2002 that police in Montgomery County, Maryland, had captured two black men suspected of being the snipers who had randomly shot 13 individuals, killing 10, in separate incidents over a period of weeks, terrorizing the people of Maryland, Virginia, and the District of Columbia, an IBM employee watching the news on television in one of IBM's Montgomery County offices exclaimed, "They should put those two black monkeys in a cage with a bunch of black apes and let the apes f--k them." A fellow employee, Robert Jordan, who is black, was in the room at the time and heard the crude exclamation. Jordan was offended and discussed

the incident with two other co-workers, who told him that the employee had made similar comments before. Jordan then reported the incident to management. A month later Jordan was fired, purportedly because he was "disruptive," his position "had come to an end," and management personnel "don't like you and you don't like them."

Jordan sued IBM and Alternative Resources Corporation ("ARC"), alleging that they jointly were his employer, for retaliation in violation of Title VII of the Civil Rights Act of 1964, and for breach of contract, fraud, and violations of local employment laws. Pursuant to the motion of IBM and ARC, the district court dismissed the complaint by order dated March 30, 2005, under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, and entered judgment on April 26, 2005. The court held that Jordan was not protected by Title VII from his employers' retaliation because no objectively reasonable person could have believed that, in reporting the incident to management, Jordan was opposing an unlawful hostile work environment.

Jordan appealed, and, for the reasons that follow, we affirm.

I

In his complaint, Jordan alleges that in October 2002, he was employed jointly by ARC and IBM in Montgomery County, Maryland, because of the business relationship between the companies. He had entered into an at-will employment relationship with ARC in December 1998 as a network technician and, before October 2002, had been assigned to work at the IBM office in Gaithersburg, Montgomery County, Maryland.

While in the network room at IBM's office on October 23, 2002, Jordan alleges that he heard his co-worker, Jay Farjah, who was watching television, exclaim — not directly to Jordan but in his presence — "They should put those two black monkeys in a cage with a bunch of black apes and let the apes f--k them." Farjah was speaking to the television in an emotional response to a report that John Allen Muhammad and Lee Boyd Malvo had been captured.*

---

*Jordan's complaint alleges that Jordan and Farjah were watching the television report "immediately" after Muhammad and Malvo's capture

Over a period of three weeks before Muhammad and Malvo were captured, they prowled the greater Washington, D.C. area and shot 13 people at random times and in public places from hidden positions. They killed 10 people and seriously wounded 3. Because of the snipers' apparent lack of motive and design, the people of Maryland, Virginia, and Washington, D.C. were terrorized. Many refused to take children to school, and others refused to leave their cars to purchase gasoline. After the snipers' names and a description of their car were released by Montgomery County police late on October 23, a motorist observed a car fitting the description at a rest stop on I-70, and Malvo and Muhammad were arrested. Jordan and Farjah were watching this breaking news report on a television at the IBM facility.

In his complaint, Jordan alleges that he was offended by Farjah's statement and reported it to two IBM supervisors, Mary Ellen Gillard and C.J. Huang, explaining that he believed that Farjah should not speak so callously in the office. After Gillard spoke with Farjah, who claimed that he only said, "They should put those two monkeys in a cage," Jordan told Gillard he was going to raise his complaint with Ron Thompson, IBM's site manager. Jordan also complained to ARC manager Sheri Mathers.

Jordan alleges that during the month following his complaints about Farjah's inappropriate statement, Gillard delayed Jordan's work shift by two-and-a-half hours and gave him additional work assignments. Jordan also alleges that Huang made a derogatory remark and gestured toward Jordan at an office Thanksgiving party. On November 21, 2002, ARC manager Mathers telephoned Jordan and fired him because, as Jordan alleges, he was "disruptive," his position "had come to an end," and IBM employees and officials "don't like you and you don't like them."

Alleging retaliatory discharge in violation of 42 U.S.C. § 2000e-3(a), 42 U.S.C. § 1981, and related state laws, Jordan sued IBM and

---

on "October 23." While Montgomery County police identified Muhammad and Malvo late in the evening of October 23, 2002, the two were not captured until the early morning hours of October 24, 2002. This discrepancy, however, is immaterial, and we assume what has been alleged in the complaint to be true for purposes of reviewing the dismissal order.

ARC based on his claim that they fired him for complaining about Farjah's statement. IBM and ARC filed a motion under Federal Rule of Civil Procedure 12(b)(6), alleging that the complaint failed to state a claim upon which relief can be granted. While the defendants' motion to dismiss was pending, Jordan filed a motion for leave to file an amended complaint to add an allegation that after hearing Farjah's remark, he discussed it with several co-workers, and "[a]t least two of the co-workers told Jordan that they had heard Farjah make similar offensive comments many times before." Jordan also proposed to add new state law claims for breach of contract, fraud, and wrongful discharge.

The district court granted the defendants' motion to dismiss, and in doing so not only ruled on the original complaint, but also considered the proposed amended complaint, concluding that it too failed to state a claim upon which relief could be granted. The court held that IBM and ARC could not be liable for retaliation because "Plaintiff has failed to allege that he engaged in a statutorily protected activity." As the court explained, "A plaintiff bringing a claim under the opposition clause of Title VII must at a minimum have held a reasonable good faith belief at the time he opposed an employment practice that the practice was violative of Title VII" (internal quotation marks, alterations, and citation omitted). The court concluded that "Farjah's comment, which [Jordan] does not allege was directed at him, simply is not such a violation." Addressing the proposed amended complaint, the court stated that the additional facts alleged

> still [do] not make "objectively reasonable" Plaintiff's belief that Defendants engaged in unlawful employment practices by allowing an abusive working environment to persist. . . . [N]o facts are alleged to indicate that these prior comments, taken alone or in conjunction with the incident involving Plaintiff, constituted a hostile work environment. Plaintiff's amended complaint does not specify the frequency, severity, or nature of the prior comments, nor even any aspect of their content; it merely states that "two of the co-workers told Jordan that they heard Farjah make similar offensive comments many times before."

From the district court's April 26, 2005 judgment dismissing Jordan's complaint, Jordan filed this appeal.

II

Our review of an order granting a motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6) is *de novo* and focuses only on the legal sufficiency of the complaint. In conducting this review, we "take the facts in the light most favorable to the plaintiff," but "we need not accept the legal conclusions drawn from the facts," and "we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000); *see also Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).

III

At the heart of Jordan's complaint is the allegation that IBM and ARC retaliated against him because he complained about Farjah's racist exclamation, made in response to a television report that the two snipers had been captured. From Jordan's experience, Farjah's comment, directed at the news report, was the only time that he had ever heard a racist comment from Farjah. Moreover, Jordan does not complain of any other similar statements made to him by others or heard by him in the workplace. He contends, however, that his complaint about Farjah's comment was about an "incipient violation" of Title VII and therefore is protected by § 704(a) of Title VII, 42 U.S.C. § 2000e-3(a) (prohibiting discrimination when an employee has opposed a practice made unlawful by Title VII). Otherwise, as Jordan argues, "[F]ew workers would accept this early-reporting invitation [to report incipient violations] if they knew they could be fired for their efforts."

IBM and ARC contend that Title VII protects an employee against retaliation for opposing workplace conduct only if the employee had both a subjective belief and an objectively reasonable belief that the employer had engaged in activity that violated the discrimination statutes. The defendants argue that on the facts alleged in this complaint, Jordan's belief could not have been objectively reasonable because "a plethora of authority holds squarely to the contrary . . . a single verbal incident in the workplace, no matter how racially charged, is [in]sufficient to create a racially hostile work environment." They

assert that "because the law on this point is so clear, Jordan [could not] have held an objectively reasonable belief to the contrary."

The relevant provision of Title VII reads:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter.

42 U.S.C. § 2000e-3(a). The plain meaning of the statutory language provides protection of an employee's opposition activity when the employee responds to an actual unlawful employment practice. Reading the language generously to give effect to its purpose, however, we have also held that opposition activity is protected when it responds to an employment practice that the employee *reasonably believes* is unlawful. *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406-07 (4th Cir. 2005) (citing *United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, 367 F.3d 245, 255 (4th Cir. 2004), *vacated on other grounds* 125 S. Ct. 2444 (2005); and *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992)); *see also Peters v. Jenney*, 327 F.3d 307, 320-21 (4th Cir. 2003). Because the analysis for determining whether an employee reasonably believes a practice is unlawful is an objective one, the issue becomes one that may be resolved as a matter of law. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) (per curiam) (resolving the objective reasonableness of Title VII plaintiff's beliefs through the summary judgment procedure).

The "unlawful employment practices" that an employee can oppose, and thereby be protected from retaliation, include practices that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Such discrimination includes maintaining a racially hostile work environment, i.e., a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67

(1986) (internal quotation marks omitted)). Courts determine "whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris*, 510 U.S. at 23); *see also Breeden*, 532 U.S. at 270 ("[W]orkplace conduct is not measured in isolation"). "A recurring point in these opinions is that simple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (citations and internal quotation marks omitted).

Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. . . . Such claims are based on the cumulative effect of individual acts"); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001).

In this case, both Jordan and the defendants agree that Jordan's complaint to IBM and ARC's managers was opposition activity and that the only conceivable unlawful employment practice that Jordan could have been opposing was a hostile work environment. Thus, the question reduces to whether Jordan complained about an actual hostile work environment or, if there was not one, whether Jordan could reasonably have believed there was one.

A

On the question of whether Jordan was complaining of an actual hostile work environment made unlawful by Title VII, we readily conclude that he was not. While Farjah's comment to the television on October 23, 2002 (or October 24) was unacceptably crude and racist, it was an isolated emotional response directed at the snipers through the television set when Farjah heard the report that they had been arrested. Because the remark was rhetorical insofar as its object

was beyond the workplace, it was not directed at any fellow employee. Moreover, it was a singular and isolated exclamation, having not been repeated before or after October 23, 2002. Jordan does not and cannot allege in his complaint that Farjah's comment altered the terms and conditions of his employment. Based on all that Jordan knew, Jordan reasonably concluded that the remark was inappropriate and should not have been made. And while we agree with Jordan's sentiment, we conclude that such an allegation is a far cry from alleging an environment of crude and racist conditions so severe or pervasive that they altered the conditions of Jordan's employment with IBM or ARC. The complaint does not describe a workplace permeated by racism, by threats of violence, by improper interference with work, or by conduct resulting in psychological harm. *See Faragher*, 524 U.S. at 787-88.

B

The question of whether Jordan could *reasonably have believed* that he was complaining of a hostile work environment made unlawful by Title VII requires more discussion and must be determined through an objective-reasonableness inquiry, as exemplified by our recent decision in *EEOC v. Navy Federal Credit Union*, 424 F.3d 397 (4th Cir. 2005).

In *Navy Federal*, management had concocted a secret and elaborate scheme to create an unfavorable personnel record and then, based on the record, fire a black female employee in retaliation for her internal complaints about race, sex, and age discrimination. The employee's supervisor refused to participate in the plan. When the supervisor's employment was terminated because the supervisor resisted management's plan, the EEOC sued Navy Federal for retaliation. We held that the supervisor's resistance and refusals were opposition activity protected by § 2000e-3(a) even though Navy Federal's management had not yet accomplished its discriminatory scheme by firing the black female employee. Thus even though Navy Federal probably was not liable at that point for actual discrimination in violation of Title VII, we held that the supervisor held "a reasonable belief that Navy Federal was unlawfully retaliating" against the employee because management "[had] *set in motion a plan* to terminate [the black female employee] in retaliation for her complaints of racial dis-

crimination, while at the same time seeking to conceal their improper motives." *Navy Fed.*, 424 F.3d at 407 (emphasis added). Even though implementation of Navy Federal's plan to fire the black female employee was not sufficiently advanced to establish an actual Title VII violation, there was no question that if accomplished, the plan would have amounted to a Title VII violation. We concluded that the supervisor could reasonably believe that she opposed an employment action made unlawful by Title VII by interrupting accomplishment of an illegal plan that she knew management was carrying out.

In this case, Jordan argues that he had an objectively reasonable belief that Title VII was about to be violated because "had [Farjah] continued, unabated, his conduct would at some point have ripened into [a] racially hostile work environment." While in the abstract, continued repetition of racial comments of the kind Farjah made might have led to a hostile work environment, no allegation in the complaint suggests that a plan was in motion to create such an environment, let alone that such an environment was even likely to occur. *Navy Federal* holds that an employee seeking protection from retaliation must have had an objectively reasonable belief in light of all the circumstances that a Title VII violation had happened or was in progress. Thus, we cannot simply *assume*, without more, that the opposed conduct will continue or will be repeated unabated; rather, the employee must have a reasonably objective belief that it will continue or will be repeated.

When considering the facts alleged by Jordan in his complaint, no objectively reasonable person could have believed that IBM's Montgomery County office was in the grips of a hostile work environment or that one was taking shape. That is, no objectively reasonable person could have believed that the IBM office was, or was soon going to be, infected by severe or pervasive racist, threatening, or humiliating harassment. Jordan had been employed at the location for four years with nary a racist or abusive incident to speak of. On the day in question, Jordan heard Farjah speak a single racial epithet while watching a television news report on the capture of two men who had terrorized their community. Although Farjah was in Jordan's presence at the time, he was not talking directly to Jordan or to any employee. Based on the complaint, the only reasonable conclusion is that Far-

jah's comment was prompted by the unique and surely never-to-be-repeated capture of snipers in the area.

Jordan's proposed amended complaint added allegations that, after hearing Farjah's comment, Jordan spoke to several co-workers, two of whom referred vaguely to some similar statements made by Farjah in the past. But there is no allegation that any of those earlier statements gave rise to a hostile environment. Indeed, no allegation is made about where or when such statements were made, or what was said. Although these observations tended to show that Farjah had a history of making inappropriate racial comments, there are no allegations that any complaints had been made about them to management. Moreover, there is no allegation that they were likely to recur at a level sufficient to create a hostile work environment. To make his argument, Jordan simply assumes that Farjah would repeat the remarks that he made before the television set on October 23 at a level much higher than his past history indicates, yet he makes no allegations to justify this assumption. He certainly has not alleged that he expected, or that an objective person would reasonably have expected, Farjah to repeat what he said on October 23.

Arguing for a rule that would protect virtually any complaint about a racist remark, Jordan maintains that as a policy matter, "it is imperative that employees report harassment early" and that, in this case, he "was acting to prevent a hostile environment from arising." He argues that the *Navy Federal* reasonableness requirement stands in tension with the early reporting policy incentives discussed in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 764 (1998), and *Faragher*, 524 U.S. at 806, especially because we have held that employers are not liable under Title VII if a complaining employee has unreasonably waited many months before reporting a case of actual discrimination, *see Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 264, 267-68 (4th Cir. 2001). Employees, Jordan argues, are left in "a double-bind — risking firing by reporting harassing conduct early, or waiting to report upon pain of having an otherwise valid claim dismissed."

Jordan's dilemma, that the law is inconsistent by both encouraging and discouraging "early" reporting, is presented at too abstract a level. The strong policy of removing and preventing workplace discrimination can and does coexist with *Navy Federal*'s objective reasonable-

ness standard. Jordan overlooks the facts that there can be a difference between an isolated racial slur and conduct that creates a hostile work environment, and that objectively reasonable employees can and do make the distinction. And it is this difference that gives rise to the undisputed principle that not every offensive comment will transform a workplace into an abusive one. The principle encapsulated in *Navy Federal*'s reasonableness standard is that it sometimes will not be reasonable for an employee to believe that the isolated harassing event he has witnessed is the first step on the road to perdition. "Title VII does not prohibit all verbal or physical harassment in the workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80; *see also id.* (reasoning that Title VII will not become "a general civility code for the American workplace" so long as courts pay "careful attention to the requirements of the statute").

As the law stands, employees are not subject to conflicting incentives. Complaining employees are protected by Title VII once they have an objectively reasonable belief that a Title VII violation has occurred or is in progress, and they have a reasonable amount of time in which to bring their concern to their employer's attention. Only at an impermissibly high level of generality can it be argued that the law inconsistently encourages employees to report and at the same time not to report violations, and Jordan's argument, if accepted, would lead to the adoption of a new rule that protects employees who have no reasonable belief that a Title VII violation has occurred or is in progress and therefore about to occur.

Jordan's argument that the *Navy Federal* rule creates a perverse incentive for employers to "fire workers quickly before they have [Title VII] claims" is hyperbolic. Employers who trap employees by firing those who use their anti-harassment reporting procedures could very well lose their affirmative defense in cases where employees do not report suspected violations, for this circuit requires that employers prove, by a preponderance of the evidence, that their anti-harassment policies are "effectively enforced" before they may use such policies to defeat discrimination claims. *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 299 (4th Cir. 2004).

Congress limited the scope of prohibiting retaliation claims, and *Navy Federal* amply, indeed generously, protects employees who rea-

sonably err in understanding those limits. We are unwilling to extend *Navy Federal* and establish a rule tantamount to a statutory civility code. Accordingly, we affirm the district court's conclusion that Jordan's complaint in this case, as well as his proposed amended complaint, fails to state a claim upon which relief can be granted.

IV

The remaining counts of Jordan's complaint, which are grounded essentially on the same core allegations that support his Title VII claim, fail to state claims upon which relief can be granted for reasons similar to or deriving from those supporting dismissal of his Title VII claim.

A

With respect to his claims for unlawful retaliation under 42 U.S.C. § 1981 and Montgomery County Code § 27-19(c)(1), Jordan acknowledges that the applicable principles are the same as those for determining liability under Title VII. *See Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004) (with respect to § 1981); *Magee v. DanSources Technical Servs., Inc.*, 769 A.2d 231, 252-53 (Md. Ct. Spec. App. 2001) (with respect to the Montgomery County Code). Because there is no actionable Title VII retaliation alleged, these claims based on the same analysis must also fail.

Additionally, Jordan relies on § 1981 to assert a claim that the defendants illegally fired him because of his race. This claim was properly dismissed because Jordan has made no allegation that his race was a motivating factor, but merely has stated a legal conclusion by repeating the elements of the cause of action. *See Bass*, 324 F.3d at 765.

Jordan also claims that "IBM's conduct constituted other unlawful behavior" as described in Montgomery County Code §§ 27-19(c)(2)-(c)(4). Section 27-19(c)(2) prohibits assisting in, compelling, or coercing discriminatory practices prohibited by the Code. The only discriminatory practice prohibited by the Code that Jordan alleges is § 27-19(c)(1) retaliation, but because he has not stated a claim for

which relief can be granted under that provision, he cannot state an assistance claim under § 27-19(c)(2). The same reasoning compels the dismissal of Jordan's § 27-19(c)(3) claim, for obstructing or preventing enforcement of the Code, and § 27-19(c)(4) claim, for attempting discriminatory practices prohibited by the Code.

B

Jordan also purports to assert claims for fraudulent inducement or breach of contract. He alleges that IBM and ARC, by promulgating anti-harassment policies outlining steps for alerting supervisors to workplace harassment, encouraged him to report Farjah's comment and then fired him for doing so.

In Maryland, a fraud claim must allege that a misrepresentation was made for the purpose of defrauding the plaintiff and that the misrepresentation's falsity was known to the defendant. *See Gross v. Sussez, Inc.*, 630 A.2d 1156, 1161 (Md. 1993). But Jordan fails to allege that the defendants, in creating and distributing their policies, acted with a purpose to defraud and with the knowledge that representations made by them were false. The fraud claim must fail for lack of those essential elements.

Jordan's claim for breach of contract must fail because IBM's and ARC's anti-discrimination policies were not enforceable contracts. While Jordan concedes this fact, he argues that we should apply promissory estoppel to "prevent injustice." Maryland courts, which disapprove of the term "promissory estoppel," have incorporated the *Restatement (Second) on Contracts* to adopt the analogous doctrine of "detrimental reliance," a tort that does not sound in fraud. *See Pavel Enterprises, Inc. v. A.S. Johnson Co.*, 674 A.2d 521, 532 (Md. 1996); *id.* at 533 n.29. To show detrimental reliance on a promise, Jordan must allege a clear and definite promise. But the policies of both IBM and ARC *expressly disclaim* creating enforceable obligations. Moreover, the policies do not clearly promise that employees will not be discharged if they report conduct they believe to be harassment.

C

Jordan also claims that IBM tortiously interfered with his ARC employment contract, pleading this claim in the alternative on the

assumption that IBM was not his joint employer. In response to the district court's dismissal of this claim because Jordan was an at-will employee, Jordan now argues that his ARC employment was contractual "in nature," albeit not a contract for a fixed term and thus terminable at will.

In *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 113 (Md. 1994), the Maryland Court of Appeals noted the existence of a "broader right" that entitles a plaintiff to sue even when "no contract or a contract terminable at will is involved" — the right to be protected from interference with economic relations. Thus, Jordan's tortious interference claim must be analyzed as a claim for interference with economic relations. *See Alexander & Alexander, Inc. v. B. Dickson Evander & Assocs.*, 650 A.2d 260, 268 n.13 (Md. 1994) ("Interference with a contract terminable at will is analyzed as interference with economic relations broadly, and not interference with a specific contract"). Interference with economic relations requires showing tortious intent and wrongful or improper conduct. *Macklin*, 639 A.2d at 119. In *Alexander & Alexander*, the Court of Appeals held that "wrongful or malicious interference with economic relations is interference by *conduct that is independently wrongful or unlawful*" and went on to identify such conduct as "violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." 650 A.2d at 271 (emphasis added) (internal quotation marks omitted).

Jordan has not alleged any conduct that is independently unlawful and accordingly fails to state a claim upon which relief can be granted.

## D

Finally, Jordan alleges that he was wrongfully discharged.

Although the Maryland Court of Appeals acknowledges the general rule that an at-will employee can be fired at any time, it has also created an exception that an employer cannot fire an at-will employee for a reason that violates a statute or public policy. *See Adler v. Am. Standard Corp.*, 432 A.2d 464 (Md. 1981). In *Adler*, the court specifically

held that the complaint must allege that the employee's discharge "contravened some clear mandate of public policy." *Id.* at 473. But such a claim may not become a substitute for violations of public policy for which a statute provides its own remedies. *See Makovi v. Sherwin-Williams Co.*, 561 A.2d 179 (Md. 1989).

While Jordan alleges that his discharge violates "Maryland public policy[, which] prohibits employers from punishing employees who report racially offensive behavior that they believe in good faith violates anti-discrimination laws," Maryland already provides statutory remedies for employees alleging retaliation, and those laws' objective criteria indicate that there is no public policy to protect employees simply for subjectively acting in good faith. The district court properly dismissed this claim also.

\*     \*     \*

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

KING, Circuit Judge, dissenting:

My colleagues of the panel majority have today concluded that, as a matter of law, it was not reasonable for an African-American employee to think that the on-the-job remark made by his IBM co-worker — "[t]hey should put those two black monkeys in a cage with a bunch of black apes and let the apes fuck them" — warranted being reported to his employers as a potential Title VII violation. And, in the majority's view, Plaintiff Robert Jordan has not sufficiently alleged that IBM's decision to fire him for making that report was racially motivated. I disagree and write separately to elaborate on my position. First, in ruling that Jordan has not stated a Title VII retaliation claim, the majority has misconstrued the facts and misapplied the law, placing employees who experience racially discriminatory conduct in a classic "Catch-22" situation.[1] Second, its conclusion that Jor-

---

[1]Because Jordan's other retaliation claims, alleged under 42 U.S.C. § 1981 and Montgomery County (Maryland) Code section 27-19, rely on the same legal principles as his Title VII retaliation claim, I also disagree with the majority's ruling that those claims were properly dismissed.

dan has not stated a claim of a racially discriminatory discharge ignores controlling Supreme Court precedent.

## I.

This proceeding is on appeal after having been dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. In reviewing such a ruling, we are obliged to accept the facts alleged by Jordan as true, and review those allegations in the light most favorable to him. *See Lambeth v. Bd. of Comm'rs*, 407 F.3d 266, 268 (4th Cir. 2005). And a proper application of these principles undermines the majority's decision in this case.

In October 2002, Jordan, an employee of IBM and ARC since December 1998, was standing near his IBM co-worker, Jay Farjah, in a television room at their IBM worksite in Maryland. Amend. Compl. ¶ 9.[2] They were watching reports on the capture of two snipers (both African-American) who had terrorized the Washington, D.C. area that fall. *Id.* As they watched, Farjah loudly stated his position that "[t]hey should put those two black monkeys in a cage with a bunch of black apes and let the apes fuck them" (the "'black monkeys' comment"). *Id.* Immediately after Farjah made the "black monkeys" comment, Jordan reported it to other co-workers. *Id.* ¶ 10. Two of those co-workers related to Jordan that "they had heard Farjah make similar offensive comments many times before." *Id.* Armed with this knowledge, and pursuant to IBM's policy that its employees were obliged to report racially discriminatory conduct to management, Jordan advised C. J. Huang and Mary Ellen Gillard, two of his IBM managers, of the "black monkeys" comment. *Id.* at ¶¶ 11-12. When Jordan requested that the IBM managers speak with Farjah and tell him "not to make such comments," the IBM managers directed Jordan to put the "black monkeys" comment in writing (and he obliged). *Id.* at ¶ 12. Huang then asked Jordan if he had considered the impact that his

---

[2]The district court denied as futile Jordan's motion to amend. In so ruling, however, the court considered the allegations of the Amended Complaint together with those of the Complaint. At oral argument, IBM conceded that the Amended Complaint's allegations are before us in this appeal.

complaint might have on Farjah, and suggested that "Farjah may have been joking." *Id.* at ¶ 13.

Thereafter, Ms. Gillard reported to Jordan that Farjah admitted to having said "they should put those two monkeys in a cage," but that he denied having made the balance of his "black monkeys" comment. Amend. Compl. ¶ 15. Jordan then advised Gillard that he wanted to bring his complaint to the attention of Ron Thompson, IBM's site manager. *Id.* Jordan also discussed the comment with Sheri Mathers, an ARC manager. *Id.* at ¶ 14.

Jordan's working conditions took a downward turn immediately after he reported Farjah's "black monkeys" comment to IBM management. Amend. Compl. ¶ 16. Prior to reporting the comment, Jordan had been authorized to start his work day at 6:30 a.m., which permitted him to pick up his son after school. *Id.* Without notice or explanation, Gillard changed Jordan's work schedule, requiring him to report to work at 9:00 a.m. each day, thereby precluding him from picking up his son from school. *Id.* Jordan also received a sudden increase in his workload. *Id.* at ¶ 17. And at the office Thanksgiving party, "Huang made a crude, derogatory remark and gesture to Jordan." *Id.* Then, on November 21, 2002 — about a month after he first complained to IBM's managers of Farjah's "black monkeys" comment — Jordan was fired from his job, at IBM's request. *Id.* at ¶ 19. According to the allegations, IBM had Jordan fired "because of his opposition to Farjah's racially offensive statement." *Id.* at ¶ 20. In the alternative, Jordan was fired "because he is African-American," and his "race was a motivating factor in the conduct and decisions of IBM and/or ARC." *Id.* at ¶ 42.

## II.

To begin with, the severity of Farjah's racially hostile "black monkeys" comment merits our consideration. It is plain that a reference to our African-American fellow citizens as "monkeys" reflects the speaker's deep hostility towards them — on the sole basis of their color. And it is equally clear that such comments constitute profound insults to our friends in the African-American community. By referring to African-Americans as "monkeys," the speaker plays on historic, bigoted stereotypes that have characterized them as uncivilized,

non-human creatures that are intellectually and culturally inferior to whites. *See, e.g.*, Jennifer M. Russell, *On Being a Gorilla in Your Midst, or, the Life of One Blackwoman in the Legal Academy*, 28 Harv. C.R.-C.L. L. Rev. 259, 260 (1993) (discussing message conveyed by gorilla picture placed anonymously in mailbox of African-American law professor: "'Claim no membership to the human race. You are not even a sub-species. You are of a different species altogether. A brute. Animal, not human.'").[3] Indeed, our Court probably understated the impact of such racially charged references in recently observing that "'[t]o suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme.'" *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 298 (4th Cir. 2004) (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001)).

In his "black monkeys" comment, Farjah openly opined that the "black monkeys" should be put in a "cage with a bunch of black apes" so that the "apes" could "fuck them." While we must endeavor to do so, our panel is scarcely qualified to comprehend the impact such a remark would have on the reasonable African-American listener. Suffice it to say that, in a single breath, Farjah equated African-Americans with "black monkeys" and "black apes," and implied a savage, bestial sexual predilection acutely insulting to the African-American community.

---

[3]Law Professor D. Marvin Jones, who has researched and written extensively on the subject, has observed that:

> The Europeans . . . equated "the unknown" with the uncivilized, and uncivilized men with animals. Hence, it is not surprising that the early Roman historian Herodotus reported that Africa was filled with "dog eared men, and the headless that have eyes in their chests." The historical record is replete with examples of Europeans attributing animal characteristics to blacks, culminating in controversial conjecture originating in . . . seventeenth[-]century England that blacks had sprung from apes.

*See* D. Marvin Jones, *Darkness Made Visible: Law, Metaphor, and the Racial Self*, 82 Geo. L.J. 437, 466 (1993).

III.

In this case, Jordan contends, inter alia, that IBM and ARC fired him for reporting Farjah's "black monkeys" comment to IBM's managers, and that his firing contravened Title VII of the Civil Rights Act of 1964 (codified at 42 U.S.C. §§ 2000e to 2000e-17). The district court ruled that his Complaint and Amended Complaint each failed to state a claim of Title VII retaliation. On appeal, the primary issue we face is whether Jordan has alleged facts sufficient to show that, in reporting the "black monkeys" comment to IBM management, he was engaged in a Title VII protected activity.

Jordan maintains that, in reporting the "black monkeys" comment to IBM and ARC, he was reasonably opposing a potential racially hostile work environment. Title VII has been consistently interpreted as prohibiting conduct that is "so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (internal quotation marks and alteration omitted). A hostile work environment is unique among the employment practices that contravene Title VII, in that such an environment normally develops through a series of separate acts, which might not, standing alone, violate Title VII. Indeed, such an environment is usually the sum of several parts. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). And whether a hostile work environment exists in fact can be a bit of a moving target; there is no "mathematically precise test." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

An employee who opposes a hostile work environment is engaged in a "protected activity" and, thus, cannot be retaliated against. *See* Title VII § 704(a), 42 U.S.C. § 2000e-3(a).[4] As we have recently recognized, a Title VII plaintiff need not show that the activity he opposed has, in fact, contravened some aspect of Title VII. Rather, he must simply have a reasonable belief that Title VII has been — or is in the process of being — violated by the activity being opposed. *See*

---

[4]In relevant part, Title VII, at 42 U.S.C. § 2000e-3(a), prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter."

*EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406-07 (4th Cir. 2005); *see also Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003) (concluding, in reliance on decisions under Title VII, that "to show 'protected activity,' the plaintiff in a Title VI retaliation case need only prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring" (internal quotation marks and alteration omitted)). Accordingly, we are obliged to vacate the district court's ruling if Jordan was engaged in a protected activity when he complained to IBM, i.e., if he reasonably believed that Title VII was being contravened when Farjah made his "black monkeys" comment.

In the majority's view, Jordan is not protected by Title VII, and IBM and ARC were thus free to fire him for reporting Farjah's "black monkeys" comment, in that he was not entitled to reasonably believe that such racially charged conduct would either continue or be repeated. *See ante* at 10. The majority's conclusion on this point, however, relies on its misapprehension of Jordan's allegations and its misapplication of the controlling legal principles. As a result, its decision has placed employees like Jordan in an untenable position, requiring them to report racially hostile conduct, but leaving them entirely at the employer's mercy when they do so.

A.

The majority maintains that no reasonable person could believe that Farjah's racially charged conduct would continue, because it was prompted by "the unique and surely never-to-be-repeated capture of snipers in the area." *See ante* at 11. On this basis, it concludes that "Jordan simply assumes that Farjah would repeat the remarks he made before the television set on October 23 at a level much higher than his past history indicates." *Id.* at 11. The majority's position, however, cannot be reconciled with the allegations of the Amended Complaint.

Our inquiry must focus on Jordan, and whether it was reasonable for him to believe that Title VII was in the process of being violated when Farjah's "black monkeys" comment was made. *See Navy Fed.*, 424 F.3d at 406-07; *Peters*, 327 F.3d at 320. Even if the capture of the D.C. snipers was a "unique and surely never-to-be-repeated"

event, a reasonable person could readily conclude that, if not confronted, Farjah would continue to make comments analogous to his "black monkeys" comment. By his Amended Complaint, Jordan has alleged that he "immediately reported [Farjah's] remark to several co-workers," and at least two of them advised Jordan "that they had heard Farjah make *similar offensive comments many times before*." Amend. Compl. ¶ 10 (emphasis added). That information provided substantial support for Jordan's reasonable conclusion that there was nothing unique about the "black monkeys" comment.

In the majority's view, the information provided by Jordan's co-workers, coupled with the "black monkeys" comment, did not allow Jordan to reasonably believe that Farjah's conduct would be repeated. As the majority sees it, a reasonable person could not make heads or tails out of such "vague" references "to some similar statements made by Farjah in the past." *Ante* at 11. Taking the co-workers' reports at face value, however, nothing was vague — Farjah had openly referred to African-Americans as "black monkeys," and he had made "similar offensive comments many times before." Amend. Compl. ¶¶ 9-10. That the specific content, dates, and conditions of Farjah's earlier offensive remarks may not have been communicated to Jordan is beside the point. The reasonable employee — like Jordan, an African-American — would have no need to question his co-workers to determine that Farjah had previously voiced racially hostile comments, and that he was likely to continue doing so. *Cf. Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 269 (4th Cir. 2001) (recognizing that victim of harassment is commanded to "report the misconduct, not investigate, gather evidence, and then approach company officials"). Accepting Jordan's allegations as true, he thus possessed an objectively valid basis for believing that Farjah had made comments that were "similar[ly] offensive" to his "black monkeys" comment "many times before." *See* Amend. Compl. ¶ 10. Jordan was thus entitled to conclude that what he had witnessed and heard in the television room was "par for the course."

Moreover, Farjah's "black monkeys" comment opened a window into his soul, revealing to Jordan a racial animus as ignorant as it was virulent. It is, in my view, entirely reasonable to believe that a person who — even in a moment of extreme frustration — equates African-Americans with "black monkeys" and "black apes," and implies that

they have a bestial sexual appetite, possesses a deep disdain for the entire black community and would likely repeat his offending conduct. The majority's view, that "Jordan simply assumes that Farjah would repeat" his racially charged conduct, *ante* at 11, is thus simply not supported by the allegations.

B.

Next, as a matter of law, I do not subscribe to the majority's view that, pursuant to *Navy Federal*, an employee lacks Title VII protection for reporting racially charged conduct, unless he has "a reasonably objective belief that it will continue or will be repeated." *See ante* at 10. On this point, the majority implies that the employee cannot meet that burden without allegations that "a plan was in motion to create [a hostile work] environment." *Id.* This position is simply incorrect, for at least two reasons. First, requiring an employee to show that a hostile work environment was being planned imagines a fanciful world where bigots announce their intentions to repeatedly belittle racial minorities at the outset, and it ignores the possibility that a hostile work environment could evolve without some specific intention to alter the working conditions of African-Americans through racial harassment. Second, *Navy Federal* concerned an employee who had opposed a discrete act that itself contravened Title VII, and we had no reason to consider the circumstances under which an employee might reasonably believe that Title VII was being violated by a cumulative unlawful practice, such as a hostile work environment.

Indeed, the Supreme Court has treated hostile work environment claims in a way that accounts for their unique, additive character. In *Morgan*, the Court observed that "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *See* 536 U.S. at 117. It instructed that Title VII "does not separate individual acts that are part of the hostile environment claim from the whole." *Id.* at 118. And the Court has recognized that an employer is entitled to assert — in order to avoid vicarious liability — an affirmative defense based in part on an employee's unreasonable failure to head off a hostile work environment's evolution. *See Faragher*, 524 U.S. at 807; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998) (the "*Ellerth/Faragher* defense"). The *Ellerth/Faragher* defense, in essence,

imposes a duty on an employee to report harassing and offensive con-
duct to his employer. *See Barrett v. Applied Radiant Energy Corp.*,
240 F.3d 262, 268 (4th Cir. 2001) (recognizing employee's "duty . . .
to alert the employer to the allegedly hostile environment" (internal
quotation marks omitted)). That duty is intended to further Title VII's
"primary objective" of avoiding harm, rather than redressing it.
*Faragher*, 524 U.S. at 806. The *Ellerth/Faragher* defense thus stands
for the proposition that an employee who unreasonably fails to report
racially hostile conduct cannot pursue a hostile work environment
claim because, by his silence, he was complicit in the conduct. *See id.*
at 806-07.

When the cumulative nature of a hostile work environment is con-
sidered, it is clear that employees are protected under Title VII from
employer retaliation if they oppose conduct that, if repeated, could
amount to a hostile work environment. *See Alexander v. Gerhardt
Enterprises, Inc.*, 40 F.3d 187, 190, 195-96 (7th Cir. 1996) (conclud-
ing that employee had reasonable, good-faith belief that Title VII vio-
lation was in progress when co-worker, on single occasion, said "if
a nigger can do it, anybody can do it," and apologized shortly thereaf-
ter). By opposing racially charged conduct that he reasonably believes
could be part and parcel of a hostile work environment, a reporting
employee has opposed the impermissible whole, even absent an inde-
pendent basis for believing the conduct might be repeated. *See
Faragher*, 524 U.S. at 806-07; *see also Morgan*, 536 U.S. at 117.
Indeed, in applying the *Ellerth/Faragher* defense, we require employ-
ees to report such incidents in order to prevent hostile work environ-
ments from coming into being. *See Matvia*, 259 F.3d at 269
("*Faragher* and *Ellerth* command that a victim of . . . harassment
report the misconduct, not investigate, gather evidence, and then
approach company officials."); *Lissau v. Southern Foods Serv., Inc.*,
159 F.3d 177, 182 (4th Cir. 1998) ("[A]ny evidence that [the
employee] failed to utilize [the company's] complaint procedure will
normally suffice to satisfy its burden under the second element of the
[*Ellerth/Faragher*] defense." (internal quotation marks and alteration
omitted)). Only a tortured reading of Title VII can support the propo-
sition that an employee who has acted to avoid complicity in a Title
VII violation has not "opposed any practice made an unlawful
employment practice." *See* 42 U.S.C. § 2000e-3(a). Indeed, in *Bar-
rett*, we recognized that an employee's "generalized fear of retaliation

does not excuse a failure to report" harassing conduct because "Title VII expressly prohibits any retaliation against [employees] for reporting . . . harassment." *See* 240 F.3d at 267.

Without question, Farjah's "black monkeys" comment is the stuff of which a racially hostile work environment is made. *See White v. BFI Waste Servs., LLC*, 375 F.3d 288, 297-98 (4th Cir. 2004) (pervasive use of terms including "boy," "jigaboo," "nigger," "porch monkey," "Mighty Joe Young," and "Zulu warrior" created triable issue of fact on hostile work environment); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 182, 185-86 (4th Cir. 2001) (same for repeated use of racial slurs, including "niggers," "monkeys," and "black bitch"). On the allegations here, it was entirely reasonable, in my view, for Jordan to believe that, in reporting the racially charged "black monkeys" comment to his employers, he was opposing a racially hostile work environment. IBM and ARC nonetheless fired him, for simply reporting this outrageous comment to them, and they thereby contravened his Title VII rights.

## C.

As a result of today's decision, employees in this circuit who experience racially harassing conduct are faced with a "Catch-22." They may report such conduct to their employer at their peril (as Jordan did), or they may remain quiet and work in a racially hostile and degrading work environment with no legal recourse beyond resignation. Of course, the essential purpose of Title VII is to avoid such situations.

The majority maintains that "[o]nly at an impermissibly high level of generality can it be argued that the law inconsistently encourages employees to report and at the same time not to report violations." *See ante* at 12. In my view, however, one need not venture into hyperbolic abstractions; Jordan's predicament provides a concrete example. Farjah's comment thrust him into the narrows between Scylla and Charybdis.[5] By our decision today, Title VII places a duty on employees

---

[5]In Homer's Odyssey, Odysseus is presented with a difficult choice: he must sail through straits that are bracketed by two monsters, and he is

(such as Jordan) to report harassing and racially charged conduct (like the "black monkeys" comment), but authorizes their employers to fire them for so doing.

IBM's use of the machinery of justice has placed its employees in exactly that unenviable situation. IBM's position in this appeal (ratified by the majority's decision) is that it can, with impunity, fire employees *because* they have reported harassing and racially charged conduct. This position is fundamentally inconsistent with Title VII and the notion of an effective anti-harassment policy, and it should alarm IBM's employees. Yet, as IBM's lawyer acknowledged at oral argument, in other judicial forums IBM actually markets its anti-harassment policy as a model of Title VII compliance, using it as a basis for the *Ellerth/Faragher* defense.

## IV.

Finally, Jordan has adequately pleaded a claim of a racially discriminatory firing, in contravention of 42 U.S.C. § 1981. I would thus also vacate the district court's dismissal of his racial discrimination claim. The Supreme Court recently clarified "that an employment discrimination complaint . . . must contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 (2002) (quoting Fed. R. Civ. P. 8(a)(2)). In *Swierkiewicz*, the Court unanimously reversed the Second Circuit, which had required a plaintiff-employee to plead the specific facts necessary to establish a prima facie case of employment discrimination. *Id.* at 515. In so doing, the Court observed that "Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions" (not including employment discrimination actions). *Id.* at 513. Accordingly, the Court concluded that Swierkiewicz had stated a valid claim of national origin and age discrimination, where his complaint "alleged that he had been terminated on

---

forced to navigate closer to one or the other. One choice, Scylla, is a six-headed creature who is certain to eat six of his crewman, while the other, Charybdis, spews forth a whirlpool that poses an uncertain risk to the entire ship and crew. On the advice of the sorceress Circe, Odysseus chose Scylla, and six of his men perished.

account of his national origin . . . and on account of his age," and further "detailed the events leading to his termination." *Id.* at 514.

Jordan has amply detailed the events leading to his improper termination, and he has alleged that he was fired for reporting Farjah's "black monkeys" comment "because he is African-American," and that "race was [at least] a motivating factor" in his discharge. Amend. Compl. ¶ 42. The majority affirms the dismissal of Jordan's § 1981 racial discrimination claim in a single sentence, not only ignoring the allegations of the Amended Complaint, *compare id.*, *with ante* at 13 ("Jordan has made no allegation that his race was a motivating factor"), but contradicting (without acknowledging) a unanimous Supreme Court decision of only four years ago.[6] I disagree and believe that the district court erred in dismissing Jordan's § 1981 racial discrimination claim.

Pursuant to the foregoing, I dissent.[7]

---

[6]The majority's reliance on our decision in *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761 (4th Cir. 2003), is misplaced. In *Bass*, we concluded that the plaintiff had not alleged a hostile work environment claim because she alleged neither conduct sufficiently severe or pervasive to create a hostile work environment, nor that any of the "hostile" acts were motivated by a protected ground. *See* 324 F.3d at 765. Jordan, by contrast, has specifically alleged that he was fired (an adverse employment action) because of his race, or in the alternative that race was a motivating factor. Amend. Compl. ¶ 42. In so doing, he certainly provided IBM adequate notice of his racially discriminatory firing claim. *See Swierkiewicz*, 534 U.S. at 514.

[7]I would reinstate two counts of Jordan's Amended Complaint: Count One (retaliation for engaging in protected activity, in contravention of Title VII, § 1981, and Montgomery County Code section 27-19); and Count Seven (racially discriminatory firing, in violation of § 1981).