MICHAEL, Circuit Judge,
dissenting:
I respectfully dissent from the majority’s holding that Mark Livingston can show no set of facts to entitle him to protection under the whistleblower provision of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A.
The whistleblower protections in § 1514A respond to
a culture, supported by law, that discourage^] employees from reporting fraudulent behavior not only to the proper authorities ... but even internally. This “corporate code of silence” not only hampers investigations, but also creates a climate where ongoing wrongdoing can occur with virtual impunity. The consequences of this corporate code of silence for investors in publicly traded companies, in particular, and for the stock market, in general, are serious and adverse, and they must be remedied.
S.Rep. No. 107-146, at 10 (2002). Section 1514A was enacted to provide such a remedy. In short, § 1514A serves to “encourage and protect [employees] who report fraudulent activity that can damage innocent investors in publicly traded companies.” Id. at 19.
To gain the protection of § 1514A, an employee only has to show that he alerted his publicly traded employer to activity that he reasonably believed constituted a violation of an enumerated law, such as the violation of a provision relating to fraud against shareholders. 18 U.S.C. § 1514A. Livingston meets this standard when the facts are read in his favor, as is required at the summary judgment stage. While working at Wyeth, Inc. (Wyeth), a pharmaceutical manufacturer, Livingston formed a reasonable belief that Wyeth was intentionally failing to comply with a consent decree that arose out of regulatory action against Wyeth by the U.S. Food and *357 Drug Administration (FDA). The consent decree compelled compliance with FDA regulations requiring good manufacturing practices aimed at ensuring product safety. When Livingston stated his concerns to his superiors, he was told that he would be fired unless he retracted his statements and stopped all reports of non-compliance at the facility where he worked. He then made an internal complaint to the company’s offices that deal with ethics and regulatory compliance, stating that he was concerned about the effect Wyeth’s cover-up would have on shareholders. Wyeth then fired him. Because these facts are sufficient to require a trial on Livingston’s § 1514A claim, I would reverse the grant of summary judgment to Wyeth. Because the majority affirms the summary judgment by construing the facts in favor of Wyeth (the non-movant), I respectfully dissent.
I.
In reviewing the award of summary judgment to Wyeth, the majority has failed to state the facts in the light most favorable to Livingston. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (stating that “[t]he evidence of the non-movant is to be believed” in summary judgment proceedings). The facts, stated in that light, are as follows.
On October 3, 2000, Wyeth became subject to a consent decree arising out of the FDA’s seizure of allegedly adulterated products from two Wyeth facilities. The consent decree was entered in a forfeiture action in which the FDA asserted that the seized products were adulterated under the Food, Drug, and Cosmetic Act, 21 U.S.C. § 351(a)(2)(B), because certain Wyeth facilities had failed to comply with federally mandated good manufacturing practices (GMPs). According to FDA regulations, GMPs require proper training of all persons engaged in manufacturing drugs. 21 C.F.R. § 211.25. The regulations specify that each employee must be trained in the pertinent GMPs and in the employee’s particular job functions. Id. § 211.25(a). Training must be “conducted by qualified individuals on a continuing basis.” Id. This training is essential “to provide assurance that [every] drug product has the safety, identity, strength, quality, and purity that it purports or is represented to possess.” Id. § 211.25(b).
The consent decree imposed binding requirements on all Wyeth facilities in its drug manufacturing division, including the facility in Sanford, North Carolina. The consent decree ordered Wyeth to hire an independent auditor to conduct a division-wide assessment of the company’s quality control and compliance with GMPs. Thereafter, Wyeth was required to submit a plan with a timetable for the correction of deficiencies to the FDA, obtain FDA approval of the plan, and comply with the timetable. The timetable adopted under the consent decree could not be altered without written authorization by the FDA.
In keeping with industry practice of reporting GMP compliance to shareholders, Wyeth represented in its 2001 and 2002 annual reports that it was complying with the consent decree. The 2001 annual report also stated that the company was making an investment of “$300 million to support our number one operating objective — to make sure that our manufacturing and operations maintain high quality standards.” J.A. 323. The statement about this investment also mentioned the consent decree and noted that Wyeth was independently “strengthening sustainable compliance.” Id.
When the consent decree was entered in October 2000, Livingston was the Manager for Training and Continuous Improvement *358 at the Sanford site. He was responsible for GMP compliance and implementation of the GMP training system. In April 2001 Wyeth (apparently pleased with his work) promoted Livingston to the position of Associate Director of Training and Continuous Improvement. He continued to be responsible for GMP compliance.
In November 2000 the independent auditor (retained pursuant to the consent decree) reported that Sanford was not complying with legally mandated GMP requirements. The auditor listed thirty-five specific deficiencies related to training, including the following: (1) many employees were manufacturing drugs with no training whatsoever, (2) managers were not trained, (3) the individuals conducting training were not properly trained themselves, and (4) training was not assessed for its effectiveness. In response to the audit report, Wyeth proposed September 30, 2002, to the FDA as the date by which the company would finish implementation and verification of GMP training compliance. The FDA apparently approved this deadline, and there is no evidence that Wyeth ever sought or was granted an extension.
Over the course of the two years leading up to the consent decree deadline for GMP training compliance, Wyeth’s Sanford site made little headway on the subject. Wyeth set several internal deadlines (November 2001 was the first) to achieve compliance before the consent decree date, but internal audits showed that the company dismally failed to meet each deadline. Sanford management pushed the November 2001 deadline first to February 2002, then to April, then to July, and finally to the actual September 2002 consent decree date — a date that Wyeth also failed to meet at Sanford. While some of these deadlines were revised, others were “met” through the use of “legacy plans.” A “legacy plan” is a term used at Sanford to describe an internal document that provides a time line for remedying non-compliance after a planned compliance date is missed.
Livingston faced stiff resistance from department directors as he attempted to remedy the serious noneompliance with training GMPs identified by the independent auditor and periodic internal audits. This resistance persisted despite Livingston’s ongoing (and increasingly urgent) reports of compliance failures.[1] For example, in November 2001 a vaccine development director informed him that she refused to implement the compliance requirements for training in her department. In December 2001, in response to Livingston’s report of compliance gaps at a meeting of the Site Quality Council (the group responsible for internally monitoring compliance at Sanford), two members of the council “verbally assaulted” Livingston and refused support for the training plan. J.A. 85. In early March 2002 Livingston reported at a staff meeting that attendance at training for Sanford directors had been abysmal. The directors nevertheless continued to avoid their training obligations. Livingston made similar reports in April and early May 2002, and he was informed by Sanford *359 management that no information regarding Sanford’s compliance failures would be shared outside the Sanford site.
As the official FDA compliance date of September 30, 2002, approached, Livingston’s reports became more urgent. The district court explained: “the state of documented training at the Sanford facility in the summer of 2002 was so abysmal that it mirrored the conditions in Pearl River, New York and in Marietta, Pennsylvania that prompted entry of the Consent Decree.” J.A. 42-43. Convinced that Sanford would be unable to meet the compliance deadline, Livingston requested a meeting with the Site Quality Council. On July 9, 2002, Bruce Kaylos, the Sanford site director, angrily informed him that he would not be allowed to discuss the compliance issue with the council.
After being blocked from meeting with the Site Quality Council about the imminent compliance failure, Livingston shared his evaluation with Kaylos and the council in a memo dated July 10, 2002. He concluded, “I do not support the request for [Sustainable Compliance Initiative] verification or attest to our state of compliance to corporate, site, and regulatory []GMP training requirements.” J.A. 709. The following day, July 11, 2002, Kaylos met with human resources to discuss putting Livingston on a “personal improvement plan” (PIP), a Wyeth personnel action threatening termination. Kaylos then left a telephone message for Livingston at his home on July 12 and had his assistant telephone Livingston at work on July 16. Livingston attempted to respond to these messages, but he was not able to speak with Kaylos. Livingston understood the telephone messages of July 12 and 16 to indicate that Kaylos had received the July 10 memo.[2] On July 24, 2002, Kaylos met with Livingston to discuss the memo. According to Kaylos’s notes of this meeting, Livingston told him that “the site and I [Kaylos] were trying to mislead FDA and corporate audit groups into believing that training was compliant.”[3] J.A. 446. As he had done previously, Kaylos instructed Livingston not to report noncompliance to Wyeth corporate headquarters. Kaylos also threatened to fire or demote Livingston if he continued to report Sanford’s failure to comply with training GMPs. That same day, in response to his meeting with Livingston, Kaylos again contacted human resources to discuss the creation of a PIP threatening Livingston’s termination.
The final internal audit prior to the FDA compliance date revealed that Sanford continued to violate GMP requirements, and it noted that Wyeth would have to adopt yet another legacy plan to address these problems. Despite the majority’s assertion to the contrary, there is no evidence that the auditor verified compliance at this time or that Livingston “signed off on [any] verification.” Ante at 348.
Around July 29 Livingston submitted a complaint to Wyeth’s Office of Ethics and Business Conduct and its Office of Sustainable Compliance (compliance office). Livingston explained that Kaylos had attempted to intimidate him in an effort to prevent *360 his accurate reporting of Sanford’s compliance gaps. Livingston concluded,
Federal law deems it a crime to make any false, fictitious, or fraudulent statement to any government agency, or in making such statement, to conceal any material fact.... If we succumb to the pressure of the moment, if we avoid our compliance obligations, if we are unwilling to do the right thing, or if we purposefully prevent the inner from matching the outer, we fail the ethics test and our Code of Conduct becomes another empty promise for employees, patients, health care providers, regulatory bodies, shareholders, and ourselves.
J.A. 745.
In response to these allegations, Wyeth’s compliance office opened an investigation and recommended that the PIP proposed by Kaylos be delayed. An investigator met with Livingston, who explained his concerns about gaps in training documentation and the impending release of adulterated vaccine. The investigator’s report found Livingston’s training compliance concerns to be “substantiate[d].” J.A. 358. In particular, the investigator found that Sanford supervisors were systematically reporting employees as trained to complete tasks for which they, in fact, lacked training, thus allowing them to manufacture adulterated drugs in violation of 21 C.F.R. § 211.25.
On September 30, 2002, the FDA compliance date, Livingston signed two documents: a verification checklist indicating that certain aspects of the training were complete and yet another legacy plan to address continued training compliance gaps. There is no evidence that Wyeth sought, or that the FDA approved, any extension of the deadline. On October 9 Wyeth’s compliance office closed the file on Livingston’s complaint without taking any remedial action. Within a week Kay-los and David McCuaig, the human resources director, placed Livingston on a ninety-day PIP. The PIP required, among other things, that Livingston “[ijmmediately end non-constructive comments to internal and external staff and contacts that the establishment and utilization of certain corporately approved and verified training practices is ‘defrauding’ the FDA.” J.A. 814. If Livingston failed to “show immediate, significant and sustained improvement within 30 days,” he would be terminated. J.A. 815.
From October through December 2002 Livingston became increasingly concerned that he was about to be terminated, based on repeated actions and comments from McCuaig, his placement on a PIP with little explanation, and a decision by Kaylos to limit his job responsibilities. Livingston and McCuaig both reported to Kaylos and were equals in the Sanford hierarchy. On December 13, 2002, McCuaig appeared at Livingston’s offsite holiday party for his team. McCuaig’s appearance was an unusual occurrence because each team had its own holiday party, so McCuaig would have been expected only to attend the human resources party. In fact, McCuaig did not attend any team holiday party other than the one held by Livingston. Using brusque terms, Livingston asked McCuaig to leave, and Livingston was fired five days later.
II.
Livingston claims that Wyeth terminated him in violation of 18 U.S.C. § 1514A. The statute protects employees of publicly traded companies from retaliation for
providing] information, causing] information to be provided, or otherwise assisting] in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire *361 fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.
18 U.S.C. § 1514A(a)(l). I would refíne certain aspects of the majority’s interpretation of the statute.
The majority states that a plaintiffs reasonable belief in a violation may not be based on “a belief that a violation is about to happen upon some future contingency.” Ante at 352 (citing Jordan v. Alternative Res. Corp., 458 F.3d 332, 340-41 (4th Cir.2006)). While I agree with this statement, it requires some elaboration. The reasonableness standard in § 1514A “is intended to impose the normal reasonable person standard used and interpreted in a wide variety of legal contexts.” S.Rep. No. 107-146, at 19 (citing Passaic Valley Sewerage Comm’rs v. U.S. Dep’t of Labor, 992 F.2d 474, 478 (3d Cir.1993)). As the majority recognizes, a similar standard is used in Title VII retaliation cases. See ante at 352; see also Allen v. Admin. Review Bd., 514 F.3d 468, 477-78 (5th Cir.2008). Under Title VII a plaintiff complaining of retaliatory discharge does not have to prove that he believed a violation had already occurred or was complete. See Jordan, 458 F.3d at 340-41 (citing EEOC v. Navy Fed. Credit Union, 424 F.3d 397 (4th Cir.2005)). Instead, he has a claim if he was retaliated against for reporting his reasonable belief that a violation “was taking shape,” that “a plan was in motion” to violate the law, or that a violation was “likely to occur.” Id. at 340-41. In other words, an employee’s belief is unreasonable (and unprotected) if it is based entirely on unsupported conjecture about hypothetical future events; his belief must relate to activity that a reasonable person could conclude is or is about to become a violation. Id. at 341.
Further, in applying the standard requiring the complainant to have an objectively reasonable belief that his employer is engaged in a violation, the majority consistently focuses on whether the violation did, in fact, occur. An actual violation is not required, however. An employee’s reasonable belief about a violation is protected even if the belief is mistaken and an actual violation never occurs. Allen, 514 F.3d at 476-77.
Finally, the majority states that “because th[e] analysis for determining whether an employee reasonably believes a law is being violated is an objective one, we resolve the question as a matter of law.” Ante at 352 n. 2 (citing Jordan, 458 F.3d at 339). The majority over-states our warrant at the summary judgment stage. Jordan simply states that “the issue [of objective reasonableness] may be resolved as a matter of law.” Jordan, 458 F.3d at 339 (emphasis added). The issue of objective reasonableness should be decided as a matter of law only when “[n]o reasonable person could have believed” that the faets amounted to a violation. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam). However, if reasonable minds could disagree about whether the employee’s belief was objectively reasonable, the issue cannot be decided as a matter of law. Allen, 514 F.3d at 477-78 (citing Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1188 (11th Cir.2001); Fine v. Ryan Int’l Airlines, 305 F.3d 746, 752-53 (7th Cir.2002)).
III.
Livingston contends that he believed Wyeth was intentionally misleading shareholders about its noncompliance with federal GMP regulations and the consent decree, in violation of § 10(b) of the Securities Exchange Act of 1934, 15 *362 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5. To avoid summary judgment on his whistleblower claim asserted under 18 U.S.C. § 1514A, Livingston must proffer evidence that (1) his whistleblower complaints implicated shareholder fraud by Wyeth; (2) he subjectively believed that Wyeth was violating § 10(b) and Rule 10b-5, that a plan was in motion to violate these laws, or that a violation was likely; and (3) his belief was objectively reasonable. See ante at 352. For his belief in a § 10(b) and Rule 10b-5 violation to be objectively reasonable, he must show that a person in his position would have believed that Wyeth (1) made “a material misrepresentation (or omission),” (2) with “a wrongful state of mind,” (3) in “connection with the purchase or sale of a security,” and that (4) a seller or purchaser would have reasonably relied on the representation or omission, (5) with resulting economic loss. Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (citations omitted). The majority holds that Livingston has not offered evidence that would create a genuine issue of fact about the elements of his claim. To reach its result, the majority places an improperly high burden on Livingston and fails to recognize fully the strength and breadth of the factual case he has offered.
First, Livingston’s whistleblower complaints implicated a violation of § 10(b) and Rule 10b-5. He was not required to specifically cite these provisions. He simply had to “provide information ... regarding any conduct” that he believed constituted a violation. 18 U.S.C. § 1514A. Livingston satisfied this burden by repeatedly reporting to Wyeth his concern that FDA regulations were certain to be violated, that violations were being covered up, and that, as a result, shareholders were being impacted adversely. As Kay-los’s notes of his July 24, 2002, meeting with Livingston reveal, and the October PIP confirms, Livingston informed Kaylos in person that he believed that the Sanford site and Kaylos were involved in fraud on the FDA. Then, in his July 29 complaint to Wyeth’s compliance office, Livingston again reported that Sanford was failing to comply with federal GMP requirements and that Kaylos had instructed him to misrepresent the state of Sanford’s compliance. Specifically, Livingston reported that Kaylos “attempted] to shame me to retract the analysis and position,” imparted the message that “we are going to conceal facts, data, and information from the verification auditor,” and threatened to fire Livingston if he “persisted in raising the awareness level of this issue up the chain-of-command.” J.A. 744-45. Livingston was convinced that Kaylos’s behavior in the July 24 meeting “violate[d] Wyeth’s Code of Conduct,” J.A. 744, and explained why in his complaint to the compliance office:
Federal law deems it a crime to make any false, fictitious, or fraudulent statement to any government agency, or in making such statement, to conceal any material fact. As I read the Wyeth Code of Conduct, this policy is in place to ensure that information provided to government agencies is truthful, accurate, and complete.
J.A. 745. Wyeth’s Code of Conduct explicitly instructed employees to avoid false reporting to government agencies and to “accurate[ly] and completely] and fairly present” information in its disclosures to shareholders. J.A. 244. Livingston concluded his complaint by asserting that “avoid[ing] our compliance obligations,” as Kaylos had suggested, would “fail the ethics test and our Code of Conduct,” which would then amount to “another empty *363 promise” for, among others, “shareholders.” J.A. 745. In short, Livingston asserted that Wyeth was covering up its noncompliance with GMP requirements and the consent decree, thus failing to keep its commitment to shareholders.
The majority argues that Livingston “did not complain of any misrepresentation or concealment,” ante at 353-54, and presumably therefore did not communicate information regarding shareholder fraud. In support of this conclusion, the majority reads the facts in the light most favorable to Wyeth, not Livingston as is required. The majority first cites Livingston’s usé of conditional language in a background paragraph in his July 29 complaint. The conditional language, however, referred to Livingston’s earlier July 10 memo to Kaylos, the Site Quality Council, and others, urging full disclosure of problems in the upcoming internal audit of training compliance. See J.A. 743 (Livingston stating in his July 29 complaint that in his July 10 memo he “expressed [his] concern that if we were to conduct the audit and not fully disclose the status of training implementation at [Sanford], [Wyeth] would be in the unfortunate position of providing false and misleading information to compliance auditors, including the FDA.”). There is nothing conditional, however, in Livingston’s report in his July 29 complaint detailing Kaylos’s response to the July 10 memo. Livingston provides an unequivocal report that Kaylos, the site director, threatened retaliation if Livingston refused to join in the plan to cover-up Wyeth’s failure to comply with federal law. The majority next concludes that Livingston told investigators that “he did not believe that anyone at the site would intentionally provide false statements.” Ante at 353-54. This quote is taken from the investigator’s letter, not Livingston. Livingston, in fact, definitively stated under oath that “I did not tell [Ed] Babiaz [the investigator] that T did not believe anyone would intentionally provide false or misleading statements.’ ” J.A. 124 (emphasis added). Livingston’s affidavit thus directly contradicts the majority’s conclusion. The majority also notes that Livingston says in his affidavit that he did not mention fraud in his July 24 meeting with Kaylos. Ante at 353-54. Nevertheless, it is uncontested that Livingston’s July 29 complaint informed Wyeth that he had been instructed to misrepresent facts about compliance. In addition, both Kaylos’s notes from the July 24 meeting and the October PIP confirm that Livingston was alleging fraud.
Livingston thus meets the first requirement for whistleblower protection because the clear text of his July 29 complaint communicates a concern about fraud on shareholders. Livingston’s assertions also provide evidence to satisfy the second and third requirements for protection: he believed Wyeth was committing securities fraud and this belief was objectively reasonable.
In particular, Livingston has provided sufficient evidence to establish that he had a reasonable belief that Wyeth was violating Rule 10b-5. First, Livingston reasonably believed that Wyeth was making (and would continue to make) material misrepresentations or omit material facts in reports to shareholders. Wyeth stated in its 2001 and 2002 annual reports that it was complying with the 2000 consent decree and that GMP compliance was its “highest priorit[y].” J.A. 323. At the time of these representations, Wyeth was not planning to comply with the consent decree, nor was it capable of achieving compliance. Every audit of Sanford’s compliance with training GMPs, up to the very last internal audit prior to the FDA compliance date, revealed Sanford’s serious failure to comply with federal requirements. Just months prior to the September 30, 2002, deadline, *364 these failures were “so abysmal that [they] mirrored conditions ... that prompted the entry of the Consent Decree.” J.A. 42^43. At this time, many of Sanford’s department directors and staff were receiving no training at all, almost half of the site had not even developed training curricula, and most of the training that occurred was deficient. Since 2000 Livingston had watched as Sanford made little effort to correct its deficiencies; he had every reason to believe that it would not — and in fact could not — come into compliance by September 30, 2002. Indeed, Livingston’s fears were realized as Sanford failed to reach compliance by this date. Based on his experience at Wyeth, Livingston also believed that Wyeth would misinform shareholders about the company’s intention not to comply with the consent decree and GMPs generally. Livingston was correct about this as well: the shareholder reports indicated that Wyeth was complying with GMPs and the consent decree when it was not, and, indeed, had no intention of doing so.
The majority makes several arguments against this aspect of Livingston’s claim. Initially, the majority argues that Livingston’s concerns about FDA noncompliance were objectively unreasonable because Sanford could not violate the consent decree. According to the majority, the consent decree “did not cover the Sanford facility.” Ante at 353-54. This conclusion is directly contradicted by the record. The express terms of the consent decree covered Wyeth’s entire drug manufacturing division, of which Sanford was a part. The consent decree ordered Wyeth to (1) hire an independent auditor to conduct “a division-wide assessment” of quality control and GMP compliance, (2) submit a plan (with a timetable) for compliance to FDA, and (3) adhere to the timetable. J.A. 1253. In a company document explaining the decree, Wyeth stated that the decree mandated that “[ejxpert consultants will examine our [quality assurance and compliance] systems at every facility making product for the U.S. market; we then must take appropriate actions to address any issues they identify in these areas.” J.A. 976 (emphasis added). A member of the task force Wyeth created to respond to the consent decree further explained, “Sanford training ... needed to implement [the GMP] conformance standards” by the September 30, 2002, deadline established in the consent decree timetable. J.A. 965. Thus, Wyeth understood that the consent decree applied to Sanford and mandated that facility’s compliance with the September 30, 2002, deadline.
The majority further argues that Wyeth could not violate the consent decree because it could always adopt a legacy plan to correct any compliance gaps still existing on the September 30 deadline. Ante at 353-54. However, as noted above, a legacy plan was an internal Wyeth procedure. There was no reason for Livingston to believe that the FDA would accept such a plan, allowing the facility to grant itself extensions to continue to violate federal law. In fact, under the binding terms of the consent decree, Livingston had every reason to believe that the FDA would not accept a legacy plan. The consent decree expressly stated that Wyeth could not alter any schedule approved by the FDA without written approval, granted at the discretion of the FDA. Wyeth’s internal decision to grant itself an extension through a legacy plan would be an obvious violation of this provision. In fact, despite the majority’s contention to the contrary, ante at 354-55, Livingston’s evidence shows that Wyeth did violate the consent decree; it is undisputed that Sanford adopted a legacy plan to address its failure to comply with GMPs on the FDA compliance date of September 30, 2002. Wyeth *365 did not petition the FDA for an extension, and the FDA did not give it written approval to extend the deadline for compliance. Thus, the consent decree’s terms assist in confirming that Livingston’s concerns were objectively reasonable because the terms clarify (1) that Wyeth’s failure to meet the FDA deadline would be an actual violation of the consent decree (as well as federal law) and (2) that a legacy plan was not a proper means to avoid the company’s regulatory obligations.
The majority finally argues that, “[wjhile Wyeth did state in its public reports for 2001 and 2002 that it was compliant with the 2000 Consent Decree (covering its Pennsylvania and New York sites and not its Sanford, North Carolina site), there is no evidence that that statement was false or misleading.” Ante at 854-55. Because the majority is mistaken about the reach of the consent decree, this conclusion is unsupported. Any statement by Wyeth that it was complying with the consent decree was false, or at the least misleading, because the company was aware that it would miss the September 30, 2002, deadline for Sanford compliance. Livingston’s beliefs that Wyeth was making material misrepresentations or omitting material facts in reports to shareholders were well founded.
Second, Livingston’s belief that Wyeth had a “wrongful state of mind” was objectively reasonable for a person in his position. Livingston had ample evidence that Sanford was engaged in a cover-up. From the inception of his efforts to bring Sanford into compliance, he was met with hostility and refusals to cooperate from his supervisors and site department directors; as the FDA compliance date approached, this resistance escalated into demands that he mislead corporate management and outside auditors. The department directors never once claimed that Livingston’s reports were unfounded; after all, he was backed by the clear results of the audits. But the directors’ resistance to training, refusal to report training failures, and refusal to implement GMPs in their own departments were clear indications that they never planned to comply with the consent decree deadline. This resistance and refusal culminated in Livingston’s July 24 meeting with Kaylos, the Sanford site director, in which Kaylos threatened to fire Livingston if he persisted in reporting regulatory failures and failed to retract his statements. This threat was eventually formalized in the October PIP. Not only was Livingston subjected to demands that he misrepresent Sanford compliance to authorities, there is independent, direct evidence that an intentional cover-up was underway at the Sanford facility. The investigation of Livingston’s internal complaint revealed that Sanford department directors were intentionally documenting untrained employees as having received the necessary training, so that they could continue working in violation of federal regulations. The threats, refusal to cooperate, and actual misrepresentation of the woeful state of training compliance by Sanford department directors is sufficient evidence to support Livingston’s belief the Sanford facility was engaging in a fraudulent coverup of its ongoing violations of federal law. It was objectively reasonable for Livingston, who knew that Wyeth was making intentional misrepresentations to the FDA, to believe that Wyeth was intentionally misleading its shareholders about its compliance with FDA regulations and the consent decree, as evidenced by the actual misrepresentations in the annual reports.
Third, Livingston reasonably believed that Wyeth’s misrepresentations in its annual shareholder reports would be material to shareholders and would cause economic loss. Under the consent decree Wyeth was subject to careful, regular re *366 views by the FDA beyond those conducted in the normal course of business. As a result, the FDA was far more likely to detect and punish any violations by Wyeth, especially violations of the consent decree. Wyeth had explained to its employees that any failure to meet the consent decree’s timetable would cost the company a $15,000 fine for each day of tardiness, up to a total $5 million dollars. Wyeth paid the government $30 million to settle the FDA enforcement action that prompted the consent decree. And the Sanford violations disclosed by Livingston were similar to those underlying the consent decree. Huge settlement costs and fines paid by a company are material to shareholders, and a reasonable shareholder would want to know whether a company is engaged in activity that could trigger such settlements and fines. See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp., 320 F.3d 920, 935 (9th Cir.2003) (airline company’s failure to comply with Federal Aviation Administration regulations, which would likely result in a sanction, was material to shareholders). Thus, Wyeth’s failure to comply with the consent decree and its ongoing obligations under FDA regulations was material to shareholders.
The majority argues that any false statement made in the annual reports could not have been viewed as material because “the FDA never issued any warning or made any observation regarding Wyeth’s training schedule deficiencies at the Sanford site during the period when Livingston made his complaint.” Ante at -. The majority erroneously magnifies Livingston’s burden. In order to prevail on a § 1514A whistleblower claim, Livingston does not have to prove that Wyeth did, in fact, violate Rule 10b-5. Nor does he have to show a working knowledge of the securities laws. He only has to provide sufficient evidence to show that a person in his position — a manager in
charge of complying with federal drug regulations and a binding consent decree— could reasonably believe that Wyeth’s reports of compliance constituted a material misrepresentation to shareholders under Rule 10b-5. Livingston had watched as the FDA seized allegedly adulterated products and extracted a massive sum in settlement from Wyeth as a result of the same compliance failures at other facilities as those that he saw at his own; as the manager responsible for compliance, he understood the huge financial impact of the consent decree, was aware of its binding nature, and understood the consequences of failure to meet its deadlines.
In sum, Livingston has produced evidence that his reports implicated shareholder fraud; that Wyeth both planned to violate and actually violated federal laws and regulations; that Wyeth management falsely reported compliance (internally and to shareholders) with these same laws; that his direct supervisor threatened him and that he was formally instructed to stop reporting non-compliance; and that Wyeth (and its shareholders) risked substantial financial loss if this cover-up was discovered in the enforcement of the consent decree. Wyeth instructed Livingston to stop his complaints, and after he refused to do so, it fired him. This evidence is sufficient to present an issue of material fact about whether Livingston’s complaints were protected under § 1514A. In addition, Wyeth has failed to present clear and convincing evidence that it would have placed Livingston on a PIP and ultimately fired him if he had not made his complaints. As a result, I would conclude that Livingston has presented sufficient evidence to survive summary judgment on his § 1514A claim, and I would remand the case for trial.

. The majority states that "Livingston found no problem with the [training] program’s progress" toward compliance through June 2002. Ante at-. This statement is incorrect. Livingston did prepare slides about compliance for possible use by the Sanford site director during a May 22, 2002, visit by a high-ranking Wyeth executive. While these slides stated that Sanford was "on track" for compliance by September 30, 2002, J.A. 569, Livingston explained that the slides were "optimistically written,” J.A. 102. He continued to express his ongoing concerns about the lack of progress in several meetings with site management both before and after the preparation of the slides.

. The majority writes that "Kaylos did not receive the memorandum until approximately July 17, 2002, because he was on vacation.” Ante at 348. While this is Kaylos's claim, we are required to view the evidence in the light most favorable to Livingston. As I have described, Livingston has produced evidence that permits the inference that Kaylos received Livingston's memo on July 10 and immediately undertook retaliatory action.

. The majority states that there were no allegations of fraud at this meeting. Ante at 348. Kaylos’s own notes contradict this assertion.